**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **EASTERN GATEWAY COMMUNITY COLLEGE,** | ) |
| 4000 Sunset Blvd., | ) |
| Steubenville, OH 43952 | ) CASE NO. |
| | ) |
| *Plaintiff,* | ) |
| | ) **COMPLAINT FOR INJUNCTIVE** |
| v. | ) **RELIEF AND DAMAGES** |
| | ) |
| **MIGUEL CARDONA, in his official** | ) **(JURY TRIAL DEMANDED)** |
| **capacity as the United States Secretary of** | ) |
| **Education, and UNITED STATES** | ) |
| **DEPARTMENT OF EDUCATION,** | ) |
| 400 Maryland Avenue SW | ) |
| Washington, DC 20202 | ) |
| | ) |
| *Defendants.* | ) |

Now comes Plaintiff, Eastern Gateway Community College ("EGCC"), by and through undersigned counsel, and for its Complaint against Defendants Secretary of Education Miguel Cardona and the United States Department of Education (collectively, "DOE" or the "Department"), states and alleges the following:

**INTRODUCTION**

1. For seven years, Eastern Gateway Community College has provided scholarships to more than 90,000 union-affiliated students through the Free College Benefit Program (the "Program").

2. Less than a month before the Fall 2022 semester was set to begin, the U.S. Department of Education issued an unprecedented and unauthorized directive to EGCC to "cease providing the Free College Benefit program" and to "not disburse Pell funds to any new students" enrolling in the program, endangering the education of approximately 30,000 current students. *See* July 18, 2022 Cease-and-Desist Letter, attached hereto as Exhibit 1.

3. What is more, despite immediate, repeated and urgent requests for clarity as to how the program might be redesigned or what specific standards must be met for EGCC to continue to serve its students, DOE has refused EGCC any opportunity to be heard. Left with no choice, EGCC brings this action to challenge the unauthorized issuance of a Cease-and-Desist Letter and subsequent enforcement actions by DOE while a federal program review is still pending.

4. As detailed throughout this Complaint, the DOE has deprived EGCC of its due process rights and exceeded its statutory authority by issuing a Cease-and-Desist Letter that has the immediate impact of significantly limiting EGCC's participation in federal financial aid, without notice or opportunity for hearing.

5. Perhaps the most striking fact of the DOE's overreach is that every allegation lodged in the Cease-and-Desist Letter and subsequent enforcement actions is apparently based on a program review determination letter that EGCC has yet to receive. As the Court will see throughout this Complaint, EGCC has tirelessly put forth numerous attempts to resolve the DOE's concerns before resorting to the filing of this Complaint, including fully complying with the demands of DOE's program review, negotiating with the DOE, proposing solutions to resolve DOE's stated concerns (including offering a full redesign of the Program), appealing the incorrect conclusions drawn in the Cease-and-Desist Letter to the DOE Office of Hearings and Appeals (appeal procedurally denied), and otherwise asserting EGCC's due process rights.

6. At every step, EGCC has been met with a refusal from the DOE to respond to EGCC's proposed redesign of the Program, a denial of appeal rights before a hearing, and even a refusal from the DOE to answer basic follow-up questions via email or phone call directly related to the Cease-and-Desist Letter that would provide the necessary parameters for EGCC to restructure its program, as the DOE suggested.

7.  Had the DOE provided EGCC with any chance to respond to or appeal DOE's arbitrary and incorrect determination that the Program violates Title IV requirements before taking the severe and immediate enforcement action of the Cease and Desist, EGCC would not have been forced to file this Complaint.

## THE PARTIES

8.  Plaintiff EGCC is a not-for-profit corporation, incorporated under the laws of the State of Ohio. EGCC is a two-year public comprehensive community college that exists under the authority of Ohio Revised Code § 3354.24 and is a political subdivision of the State of Ohio. At all times relevant to this Complaint, EGCC has operated a community college branch in Steubenville, Ohio and Youngstown, Ohio.

9.  Defendant Miguel Cardona is Secretary of Education and is sued in his official capacity pursuant to 5 U.S.C. § 702.

10. Defendant DOE is an executive agency of the Federal Government of the United Sates empowered to administer the Pell Grant Program pursuant to 20 U.S.C. § 1070a(a)(1). As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over Plaintiff's Complaint pursuant to 28 U.S.C. §§ 1331 and 1346, which provides for original jurisdiction over civil suits arising under the Constitution, laws, or treaties of the United States and administrative agencies, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701-06.

12. This Court has the authority to issue declaratory relief, injunctive relief, and other relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the APA, 5 U.S.C. §§ 702, 705-06.

13. This is a civil action in which Defendants are agencies of the United States or officers of such an agency. Venue is proper in this Court because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1).

## FACTUAL BACKGROUND

### EGCC and the Free College Benefit Program

14. EGCC's Free College Benefit Program provides access to "free college" for union members and their families. The Program follows the "last-dollar" or "last-mile" model of free college, in which an entity – including a State government or institution – will pay any tuition remaining at a public college after a student's existing federal financial aid award is used. This model is one of two common models of free college[1], and is used by States at large, for example, by Rhode Island, Tennessee, and Utah, but it is also employed by individual institutions, like EGCC.

15. Under the Program, all students are charged the same rate for tuition and fees, regardless of their Title IV eligibility. Next, eligibility for Pell Grants is calculated and applied in accordance with DOE policy[2] and federal financial aid regulations, factoring in the student's enrollment status, cost of attendance, and expected family contribution. After Pell Grants are applied, any state aid, employer or other third-party education grants are applied. The remaining balance, if any, is covered by a last-dollar scholarship through tuition waivers under the Program.

16. In order to offer qualifying students the last-dollar scholarship, EGCC obtained approval from the Chancellor of the Ohio Department of Higher Education ("ODHE") as required by Ohio law. *See* 381.170 of Am. Sub. H.B. 166 and Directive 2009-011. EGCC received approval through

---

[1] *First-Dollar vs. Last-Dollar Promise Models*, Association of Community College Trustees, https://www.acct.org/page/first-dollar-vs-last-dollar-promise-models.
[2] Packaging Aid | 2022-2023 Federal Student Aid Handbook.

4

ODHE for offering institutional support such as last-dollar scholarships (tuition waivers) up to $3,500 per year for each eligible in-state student, and up to $6,000 per year for each eligible out-of-state student. *See* ODHE Directive, attached hereto as Exhibit 2.

17. Accordingly, students participating in the Program generally do not need to borrow Federal Direct Loans because the Pell Grant, other aid, and/or the last-dollar scholarship through tuition waivers cover the student's tuition and fee costs. Eligible students participating in the Program may borrow up to $1,000 in loans per semester to help offset indirect educational expenses, however, they cannot incur debt in excess of $1,000 per semester without forfeiting their eligibility for the Program.

18. The last-dollar scholarship is treated as a payment of tuition and fees that have been charged to the student. As such, per DOE policy, the scholarship is considered part of a student's estimated financial assistance ("EFA") and the full amount of the tuition and fees are included in a student's cost of attendance.[3]

## Relevant Statutory and Regulatory Framework

19. The Pell Grant Program, a Federal student financial assistance program authorized under Title IV of the Higher Education Act of 1965 (hereinafter "HEA" or "Title IV"), as amended, 20 U.S.C. § 1070 *et seq.* . The Pell Grant Program awards grants (not loans) to help financially needy students who need assistance meeting the cost of their postsecondary education. 20 U.S.C. § 1070; 34 C.F.R. § 690.1 (1994).

20. To participate in the Pell Grant Program, an institution first must establish eligibility as an "institution of higher education." 20 U.S.C. § 1099c(a); 34 C.F.R. § 600.4.

---

[3] Cost of Attendance (Budget) | 2022-2023 Federal Student Aid Handbook

21. To qualify as an eligible "institution of higher education," a school must, among other things, provide an educational program for which it awards an associate degree and/or "prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1001(a); *see also* 34 C.F.R. §§ 600.4(a)(4), 668.8(c). It also must possess accreditation from a nationally recognized accrediting agency. 20 U.S.C. § 1001(a)(5); 34 C.F.R. § 600.4(a)(5).

22. An institution may participate in the Pell Grant Program as long as it complies with eligibility requirements and until the Department officially determines that it no longer does so. If the Department seeks to limit or terminate an institution's participation, it must initiate a limitation or termination proceeding by sending an institution or third-party servicer a notice by certified mail. 20 U.S.C. § 1094(c)(1)(F); 34 C.F.R. §§ 600.41, 668.86. Such notice must, among other requirements, inform the institution of the intent to limit or terminate the institution's participation in federal financial aid, cite the consequences, identify the alleged violations that constitute the basis for the action, state any limits to be imposed, and specify that the limitation or termination will not be effective from the date of the notice if the institution requests a hearing. If a hearing is requested, the limitation or termination does not take place until after the requested hearing is held 34 C.F.R. §§ 668.86(b)(3)-(4), 668.88, 668.89.

### DOE's Cease-and-Desist Letter

23. On February 7, 2022, the DOE began an off-site program review at EGCC. The stated purpose of this review in the DOE's January 24, 2022 announcement letter was to "assess EGCC's administration of the Title IV, HEA programs in which it participates." This review is still ongoing.

24. In addition to working to respond to the weekly, if not daily document requests from the DOE, EGCC participated in multiple phone interviews with DOE staff. Through April and May 2022, the DOE conducted lengthy interviews with Michael Geoghegan, President of EGCC, and

Kurt Pawlak, Associate Vice President for Financial Aid at EGCC. These interviews lasted over two hours each, and neither Mr. Geoghegan nor Mr. Pawlak were permitted attorney representation during the interviews.

25. On July 18, 2022, the DOE issued a Cease-and-Desist Letter to EGCC alleging that the Program administered through EGCC was in violation Title IV and instructing EGCC to cease providing the Program in its current form.

26. In the letter, the DOE alleged that Title IV recipients enrolled under EGCC's Program were charged more than non-Title IV recipients enrolled under the same Program. The DOE asserts that this is in direct contravention to the definition of "cost of attendance" in Section 108711 of Title IV (requiring an institution to use an amount that is "normally assessed a student carrying the same academic workload" when establishing the tuition and fee component for Title IV recipients). The DOE also cited to guidance stating that a recipient of Title IV assistance cannot be assessed charges that are higher than what is charged to a student not receiving Title IV aid. *See 2021-2022 Student Financial Aid Handbook*, Vol. 3 at 56.

27. Finally, the Cease-and-Desist Letter also prohibited EGCC from disbursing Pell Grant funds on or after July 18, 2022 to any new students enrolling in the Program.

28. Without the ability to disperse Pell funds to new students, EGCC does not have the ability or funding to enroll future students in the Program. Pell funds account for approximately 74.5% of EGCC's overall revenue.

29. On July 19, 2022, EGCC responded to the DOE's Cease-and-Desist Letter. The pertinent points of EGCC's response are as follows:

a) The Program does not charge a higher amount for Pell recipient students. The tuition and fees are the same for both populations, and EGCC's program simply ensures that all students can attend college free of charge, regardless of their Pell eligibility.

b) There is no requirement in the HEA or any other regulation or guidance that scholarships must be funded by State or local governments rather than institutional dollars.

c) So-called "last dollar scholarships," like EGCC's, are generally accepted as one of two common models of "free college." Under this model, an entity—including a State government or institution—will pay any tuition remaining at a public college after a student's existing federal financial aid award is used.

d) The DOE's directive that EGCC "must not" disburse Pell funds to any new students" until the Program is "redesigned to charge full tuition and fees for non-Pell students" and must "cease waiving the tuition and fees for non-Pell students" is wholly unfair as it does not provide specific instructions on how this might be accomplished or what specific standards must be met. This is even more true, given that the Cease-and-Desist letter was sent less than a month before classes started for union-affiliated students on August 15, 2022.

30. The Cease-and-Desist Letter was the first communication received by EGCC indicating the DOE finds EGCC's Program problematic. At the same time, the Cease-and-Desist Letter is presented as a final decision, effective almost immediately, with no opportunity to remedy or avenue for appeal before EGCC's access to Pell funds is limited.

31. EGCC requested that the DOE provide EGCC with an opportunity to disburse Pell funds for the fall semester and offer the free educational benefit promised to the students already enrolled.

32. EGCC further followed up with the DOE on July 20th and the 21st, seeking additional information regarding the status of the approximately 30,000 union-affiliated students currently enrolled in the Program for the Summer and/or Fall terms.

33. On July 22, 2022, EGCC filed an Appeal of Limitation (OPE ID: 00727500) with the United States Department of Education Administrative Actions and Appeals Division. *See* Appeal, attached hereto as Exhibit 3. EGCC asserted the following Issues and Facts in Dispute:

      a.     EGCC disputes that it assesses tuition and fee charges that are higher for Title IV recipients as compared to non-Title IV recipients.

      b.     EGCC disputes that outside entities "provide virtually no funds" toward the Program,

      c.     EGCC disputes that its institutional support to cover the "last dollar" of college tuition for union-affiliated students qualifying for the Free College Benefit violates any statutory or regulatory requirement.

      d.     EGCC disputes that all comparable last-dollar scholarship programs are fully funded by a third-party source of income.

      e.     EGCC disputes that last dollar scholarships, including through institutional support and tuition waivers, create discrepant tuition pricing for Pell-eligible students as compared to Pell-ineligible students.

      f.     EGCC disputes that its implementation of the Free College Benefit has put EGCC in "a very precarious financial position" or "calls into question EGCC's continued viability as an educational institution," as stated in the Cease-and-Desist Letter.

34. The Director of the Administrative Actions and Appeals Service Group responded to EGCC's Appeal of Limitation on July 26, 2022, indicating that the Cease-and-Desist Letter was

not a limitation action and, therefore, EGCC had no basis for appealing the DOE's decision. *See* Appeal Denial, attached hereto as Exhibit 4. The letter first incorrectly states that the Program violates Title IV, yet in the next paragraph, concludes that EGCC has no basis for appeal and states that the appeal will not be forwarded to the Department's Office of Hearings and Appeals.

35. In an effort to better understand the DOE's position given the conflicting instructions in the Cease-and-Desist Letter and the denial of the Appeal, EGCC requested a call with Dr. Jeremy Early of the Office of Federal Student Aid, who signed the Cease-and-Desist Letter. Initially, Dr. Early agreed to a call on July 27, 2022. However, after President Geoghegan provided Dr. Early with the questions EGCC intended to ask on the call—all of which were directly related to the Cease-and-Desist Letter and the concerns raised therein—Dr. Early cancelled the meeting, noting in his cancellation that "the Department would like to postpone the meeting scheduled for today so that we can internally discuss all of the questions and provide answers." As of the date of this Complaint, EGCC has yet to receive a response on most of the questions submitted on July 27, 2022.

36. On July 29, 2022, the DOE notified EGCC that students who had been attending the Program at EGCC for the Spring and/or Summer semesters, but who had not registered for classes by the date of the Cease-and-Desist Letter (July 18, 2022) were entitled to receive Title IV aid for the Fall 2022 semester.  *See* Notice, attached hereto as Exhibit 5.

37. On August 5, 2022, in response to the questions EGCC's submitted on July 27, 2022, EGCC received correspondence from the DOE stating that it "does not respond to hypothetical questions like those posed by EGCC" and instead, "[i]f EGCC provides a concrete proposal for the revised program, the Department will provide its position as to whether that plan is consistent with Title IV requirements." *See* Correspondence, attached hereto as Exhibit 6. The

correspondence also stated that the DOE determined there were "virtually no funds being provided by any sources outside of Title IV" and that "Title IV funds are essentially funding the 'free tuition' for non-Title IV students." The DOE suggested that EGCC could remedy the foregoing by seeking funding from outside sources including third party grants or endowments.

38. On August 8, 2022, EGCC received correspondence from DOE placing EGCC on the Heightened Cash Monitoring 2 ("HCM2") method of payment effective immediately. *See* HCM2 Letter, attached hereto as Exhibit 7.  HCM2 requires EGCC to disburse institutional funds to Pell-eligible students prior to requesting and receiving reimbursement from the DOE. As such, EGCC must have institutional funding available to cover initial disbursements to the more than 30,000 students enrolled in the Program while it waits for DOE's review and approval of any Pell Grant funds. DOE also reserved "the right to offset any federal claims against funds due to EGCC" and reserved the right to take administrative action against EGCC in the future.

39. On August 10, 2022, in response to the DOE's August 5, 2022 correspondence suggesting that EGCC provide a proposal for redesign, EGCC provided DOE with a proposed redesign of the Program in which the last-dollar scholarships would be funded through the EGCC Foundation, a distinct 503(c)(4) non-profit entity. To date, EGCC has not heard from DOE regarding its proposal.

40. Also, on August 10, 2022, a few hours after EGCC submitted the Program redesign proposal, EGCC received additional correspondence from DOE requiring EGCC to propose and then enter into a teach-out agreement within thirty (30) days. *See* Teach-Out Letter, attached hereto as Exhibit 8. The teach-out agreement will effectively require EGCC students, including but not limited to students enrolled in the Program prior to July 18, 2022, to transfer out of EGCC to complete their programs of study.

41. DOE's Cease and Desist, placement of EGCC on heightened cash monitoring status, and demand of a teach-out agreement all cite to the pending program review as forming the basis for DOE's enforcement actions. However, DOE has not yet issued the program review report with its findings, depriving EGCC of any opportunity to respond to the report's allegations.

42. Enrollment for the Spring semester is scheduled to begin at EGCC in October 2022.

**Irreparable Harm**

43. Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's illegal actions.

44. DOE's actions create certain and imminent financial losses so severe to EGCC that it threatens its continued operations as a community college. Currently, approximately 30,000 students are enrolled in the Program. DOE's Cease-and-Desist Letter prohibits any new enrollments and requires EGCC to provide a teach out agreement, effectively securing the transfers of all current students to other institutions. These actions irreparably harm EGCC's proprietary interests, preventing new enrollments and forcing current students to disenroll from EGCC. Disenrollment results in a drop in tuition payments to the institution, including Pell Grants and state subsidies, the primary sources of EGCC's funding. No statutory provision exits that would enable EGCC to recoup this lost tuition from DOE if EGCC prevailed at the conclusion of this litigation.  Additionally, DOE's unlawful actions deprive EGCC of its constitutional due process, causing irreparable harm.

45. Thousands of EGCC students will be seriously harmed by the DOE's action. DOE's incorrect determination the Program violates Title IV requirements and unauthorized Cease and

Desist denies access to college to vulnerable students (at the heels of a pandemic), forcing them to abandon or unreasonably delay their higher education.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of 5 U.S.C. § 702 and 34 C.F.R. § 668.86(b)(1)(iii)

46. EGCC re-alleges and incorporates by reference herein all prior allegations contained in this Complaint.

47. In general, 5 U.S.C. § 702 gives a right of review of a federal agency action: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

48. Final agency actions are subject to judicial review. 5 U.S.C. § 704. The DOE's Cease-and-Desist Letter constitutes final agency action because the action 1) marks the consummation of the agency's decision-making process in that it is not merely tentative or interlocutory in nature; and 2) is one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997).

49. The Cease-and-Desist Letter is an attempt on behalf of the DOE to avoid review of a final action.

50. As a direct and proximate result of the DOE's unlawful action, EGCC has been materially damaged and will continue to incur such damage.

51. An actual, justiciable controversy exists between EGCC and the DOE for which EGCC has no adequate remedy at law.

52. Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and

teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's illegal actions.

**COUNT II**
**The DOE's Decision Violated EGCC's Right to Due Process Under the Administrative Procedure Act (Agency Action in Excess of Statutory Authority, Short of Statutory Right, or Not in Accordance with Law)**

53. EGCC re-alleges and incorporates by reference herein all prior allegations contained in this Complaint.

54. The Administrative Procedure Act ("APA") requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory authority, short of statutory right, or not in accordance with law. 5 U.S.C. § 706(2)(A), (C).

55. 20 U.S.C. § 1094 of the Higher Education Act ("HEA") outlines the comprehensive enforcement tools and actions the DOE may take with respect to an institution it believes in violation of Title IV of the HEA. These specific enforcement actions include suspension, limitation or termination of the participation in federal financial aid programs, as well as emergency actions. All such actions provide for notice and show cause or administrative appeal.

56. As EGCC argued in its appeal (the opportunity for which was denied by DOE before even being sent to the Office of Hearings and Appeals for hearing), the DOE's issuance of the Cease-and-Desist Letter constituted a limitation of EGCC's ability to participate in federal financial aid, yet the DOE failed to abide by the established regulatory procedures outlined in 34 C.F.R. § 668.86 to initiate limitation proceedings.

57. The Cease-and-Desist Letter informed EGCC for the first time of the DOE's interpretation that the Program administered by EGCC violates the Title IV prohibition against assessing charges to Title IV recipients that are higher than those charges assessed to non-Title IV recipients. By concluding that the Program is ineligible and ordering that EGCC cease enrollment of any new

students in the Program, the Cease-and-Desist Letter immediately limited EGCC's participation in federal financial aid.

58. The DOE's subsequent demand that EGCC enter into a teach-out agreement is further evidence that the Cease-and-Desist Letter is a limitation, because under 20 U.S.C. § 1094(f)(1), teach out agreements are required only "in the event the Secretary initiates the limitation, suspension, or termination of the participation of an institution of higher education."

59. The HEA provides that the Secretary shall prescribe regulations necessary for "the limitation, suspension, or termination of the participation in any program under this subchapter of an eligible institution…whenever the Secretary has determined, *after reasonable notice and opportunity for hearing*, that such institution has violated or failed to carry out any provision of this subchapter, any regulation prescribed under this subchapter." 20 U.S.C. § 1094(c)(1)(F) (emphasis added). The Subpart G regulations at 34 C.F.R. § 668.86(b) outline the specific procedures to be applied in order to initiate limitation or termination proceedings. The regulations at 34 C.F.R. § 668.86(b) require that the DOE provide notice to the institution that includes: the intent of the DOE to limit or terminate the institution's participation or servicer's eligibility; citations to the consequences of that action; identification of the alleged violations that constitute the basis for the action; and the limits to be imposed. In addition, the notice must inform the institution that the limitation or termination will not be effective on the date specified in the notice if the DOE receives a request from the institution for a hearing or written material indicating why the limitation or termination should not take place.

60. The Cease-and-Desist Letter fails to include any of the requirements outlined in the regulatory framework for limitation proceedings. Although EGCC has demonstrated to the DOE on countless occasions throughout this program review that the tuition and fees rate assessed to

students is the same regardless of whether students are eligible for Title IV aid, the DOE draws the incorrect conclusion that EGCC's program "as currently implemented" violates Title IV and immediately limits EGCC's participation in federal financial aid. The Cease-and-Desist Letter unallowably provides for no opportunity for appeal or response by EGCC.

61. When EGCC attempted to assert its administrative appeal rights under 20 U.S.C. § 1094 and 34 C.F.R. § 668.86, it was denied the opportunity for hearing. By circumventing the procedural requirements specifically applicable to limitation actions, the DOE violated EGCC's right to due process.

62. To read the Cease-and-Desist Letter as anything but a limitation on EGCC's federal financial aid participation and a denial of due process is to ignore the significant, immediate impact of the DOE's action. There are approximately 30,000 students currently enrolled in the Program whose pursuits in higher education are now uncertain due to DOE's inconsistent and arbitrary interpretation of the HEA and its continued denial of EGCC's due process rights.

63. Notably, the Cease-and-Desist Letter is not warning EGCC to stop issuing federal financial aid to students that are ineligible; in fact, there is no allegation that EGCC incorrectly packaged and awarded federal financial aid to qualifying students. Nor does the Cease-and-Desist Letter identify an academic program or additional location as ineligible to participate in Title IV. Instead, the Cease-and-Desist Letter is a broad limitation of EGCC's participation in Pell based only on students' union-affiliation and qualification for institutional scholarship and tuition waiver under the Program.

64. However, even if the Court determines that the Cease-and-Desist Letter does not constitute a limitation of EGCC's participation in federal financial aid, the only remaining conclusion is that the DOE's Cease-and-Desist Letter exceeds the DOE's statutory authority.

65. Given the comprehensive statutory framework under 20 U.S.C. § 1094 providing for suspension, limitation, termination, and emergency action proceedings, Congress clearly and intentionally defines the finite avenues through which DOE can enforce federal education laws and regulations, which do not include cease-and-desist letters. In fact, in other contexts that do not apply to federal financial aid, Congress specifically includes the use of cease-and-desist letters as a method of enforcement. The General Education Provisions Act (GEPA), for example, specifically contemplates the use of cease-and-desist letters as an enforcement mechanism, subject to notice and hearing opportunity. 20 U.S.C. § 1234(e). While GEPA specifically provides for the DOE's use of cease-and-desist letters in applicable programs *excluding* federal financial aid programs, 20 U.S.C. § 1234(i)(2)), the HEA specifically provides for other methods of enforcement that do not include cease and desist letters, or any similar enforcement action (suspension, limitation or termination actions) that does not provide notice and an opportunity for hearing.

66. If the Cease-and-Desist Letter does not constitute a limitation of EGCC's participation in federal financial aid, then the DOE has exceeded its statutory authority by issuing an enforcement action that is not contemplated by law. The DOE exceeded its authority in issuing the Cease-and-Desist Letter, which has the immediate impact of an enforcement action (albeit of a rule against institutional last-dollar scholarships that does not yet exist), yet provides for none of the due process mandated by the enforcement actions that *are* explicitly provided for under 20 U.S.C. § 1094 and 34 C.F.R. § 668.86.

67. As such, in issuing the Cease-and-Desist Letter, the DOE has grossly exceeded its statutory authority, falls short of statutory right, and has not acted in accordance with law.

68. As a direct and proximate result of the DOE's unlawful action, EGCC has been materially damaged and will continue to incur such damage.

69. An actual, justiciable controversy exists between EGCC and the DOE for which EGCC has no adequate remedy at law.

70. Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's illegal actions.

**COUNT III**
**The DOE's Decision Violated EGCC's Right to Due Process Under the Administrative Procedure Act (Arbitrary and Capricious Agency Action)**

71. EGCC re-alleges and incorporates by reference herein all prior allegations contained in this Complaint.

72. The APA requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A).

73. A rule is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).

74. The DOE's interpretation of 20 U.S.C. § 108711 is an arbitrary and capricious agency action because, among other reasons, the DOE failed to articulate how its position comports with the plain text of Section 108711 of the HEA and why it was reversing its own guidance regarding

18

how Pell is a first source of aid and tuition waivers do not change the underlying cost of attendance, generating an unexplained inconsistency in the DOE's position of which it appears to be unaware.

75. The DOE substantively changed its longstanding position without complying with the notice and comment requirements of the APA.

76. In the Cease-and-Desist Letter, the DOE incorrectly and without legal support concludes that using institutional scholarships or tuition waivers for the remaining balances of union-affiliated students qualifying for the Program effectively changes the underlying cost of attendance and therefore is unallowable.

77. Further, the DOE attempts to distinguish EGCC's Program from other free college programs by arbitrarily and without notice or legal support concluding that last-dollar scholarships must be funded by an "outside entity", which it asserts may include state appropriations or a college's foundation, but cannot be funded through institutional scholarships or tuition waivers.

78. The DOE's incorrect first in time determination that offering institutional support through tuition waivers changes the cost of attendance and results in differential tuition charges to Pell-eligible and ineligible students directly contradicts existing regulations and guidance on Pell being a first source of aid, and tuition waivers only impacting other need-based Title IV awards:

79. "Pell Grants are considered to be the first source of aid for students with financial need. A student's eligibility for aid from the other need-based programs is then determined by subtracting the student's [expected family contribution] and [estimated financial assistance] (including the student's Pell Grant) from the [cost of attendance (COA)]." FSA Handbook (2021-2022), Vol. 3, Ch. 7, p. 3-193.

80. "Effects of waivers on COA: If your school treats a waiver as a payment of tuition and fees that have actually been charged to a student, then the waiver is considered estimated financial

19

assistance (EFA) and the full amount of the tuition and fees are included in a student's COA." FSA Handbook (2021-2022), Vol. 3, Ch. 2, p 3-60.

81. "A correctly determined Pell Grant is never adjusted to take into account other forms of aid." FSA Handbook (2021-2022), Vol. 3, Ch. 7, p. 3-195.

82. The notion that Pell Grants serve as the first source of aid is affirmed in federal financial aid regulations. Pell eligibility requirements at 34 C.F.R. § 690.6 do not include consideration of other forms of aid. In contrast, eligibility requirements for other forms of aid, such as student Stafford loans at 34 C.F.R. § 682.201(a), require that a student "receive[] a final determination, or, in the case of a student who has filed an application with the school for a Pell Grant, a preliminary determination, from the school of the student's eligibility or ineligibility for a Pell Grant." *See also* 34 C.F.R. 673.5(b) (noting that estimated financial assistance must be considered when awarding Federal Perkins loan, FSEOG or FWS employment). As such, Pell eligibility, waivers of tuition, non-need-based awards, scholarships, and other grants must first be determined in order for other federal sources of financial aid to be calculated.

83. EGCC's application of a last-dollar scholarship/tuition waiver through the Program complies with the regulations and the FSA Handbook. As detailed throughout this Complaint, all students are charged the same rate for tuition and fees; eligibility for Pell Grants is then calculated and applied in accordance with federal financial aid regulations; then any state aid or employer education grants are applied. After Pell Grants and applicable state aid and employer assistance, the remaining balance, if any, is covered by the last-dollar scholarship in the form of a tuition waiver.

84. Neither Congress nor DOE has addressed free college programs following a last-dollar model. DOE's longstanding silence on this issue – despite the prevalence of such programs[4] and the widespread policy discussion surrounding methods of reducing college costs – creates a reliance interest, which DOE failed to take into account in its arbitrary determination that such programs must have an outside funding source.

85. Further, the DOE ignores important aspects of the problem, and its decision to enforce its unlawful position runs counter to the evidence before the DOE.  The DOE also considered factors Congress did not intend it to consider.  The model used by EGCC is one of two common models of free college, and is used by States at large, for example, by Rhode Island, Tennessee, and Utah and individual institutions like EGCC.

86. As a direct and proximate result of the DOE's unlawful action, EGCC has been materially damaged and will continue to incur such damage.

87. An actual, justiciable controversy exists between EGCC and the DOE for which EGCC has no adequate remedy at law.

88. Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's illegal actions.

---

[4] *See, e.g.,* College Promise, identifying 362 free-college programs nationwide, https://www.mypromisetool.org/?source=college-promise-web; Campaign for Free College Tuition, identifying free college tuition programs in at least 32 states, https://www.freecollegenow.org/promise_programs; *Community College Recover Students Through Free Tuition, The Psychological Power of the Word 'Free'*, Inside Higher Education, August 11, 2022.

**COUNT IV**
**The DOE's Decision Violated EGCC's Rights to Constitutional Due Process**

89. EGCC re-alleges and incorporates by reference herein all prior allegations contained in this Complaint.

90. EGCC is entitled to a constitutionally protected life, liberty, or property interest.

91. The DOE has deprived it of that protected interest.

92. The DOE's procedures were constitutionally inadequate or unfair.

93. The DOE did not provide adequate notice and opportunity to be heard before depriving EGCC of its constitutionally protected interest.

94. As a direct and proximate result of the DOE's unconstitutional action, EGCC has been materially damaged and will continue to incur such damage.

95. An actual, justiciable controversy exists between EGCC and the DOE for which EGCC has no adequate remedy at law.

96. Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's unconstitutional actions.

**COUNT V**
**The DOE's Decision Violated EGCC's Rights to Due Process Under the Administrative Procedure Act (Agency Action Without Observance of Procedure Required by Law)**

97. EGCC re-alleges and incorporates by reference herein all prior allegations contained in this Complaint.

98. The APA requires that a court hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law.  5 U.S.C. § 706(2)(D).

99. The agency must publish a "[g]eneral notice of proposed rulemaking" in the Federal Register. 5 U.S.C. § 553(b). That notice must describe "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

100.    The agency must further provide "interested persons" an "opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

101.    The DOE substantively changed its longstanding position without complying with the notice and comment requirements of the APA.

102.    In the Cease-and-Desist Letter, the DOE incorrectly and without legal support concludes that using institutional scholarships or tuition waivers for the remaining balances of union-affiliated students qualifying for the Program effectively changes the underlying cost of attendance and therefore is unallowable.

103.    DOE's Cease-and-Desist Letter seeks to enforce a rule that using institutional last-dollar scholarships or tuition waivers that are not funded entirely by outside sources effectively changes the underlying cost of attendance and is therefore unallowable.

104.    The problem with this is twofold. First, as detailed throughout this Complaint, DOE's enforcement action without notice or opportunity for hearing deprives EGCC of its due process rights under the HEA, the APA, and the Constitution. Second, and pertinent to this claim, is that the rule DOE seeks to enforce does not exist. DOE cites no legal support for its position because no legal support exists. Nowhere in the HEA, the implementing regulations, or guidance will the Court find support for DOE's position that institutional last-dollar scholarships effectively change the cost of attendance and must be funded entirely by an outside source.

105.     In fact, as detailed in Count III, DOE guidance explicitly states the opposite: that tuition waivers treated "as a payment of tuition and fees that have actually been charged to a student" (as EGCC does) does not reduce the cost of attendance, but rather "the full amount of the tuition and fees are included in a student's COA."

106.     Moreover, the last-dollar scholarship model is widely used in schools across the country. If DOE's incorrect interpretation that these scholarships change the cost of attendance and must be entirely funded by outside sources is treated as an enforceable rule, the allowability of all of these last-dollar scholarship programs is called into question.

107.     The DOE cannot enforce a rule that does not exist, especially in a way that seeks to limit or terminate EGCC's participation in federal financial aid without notice or opportunity for hearing.

108.     Before the DOE can enforce a rule, it must first follow the long-established statutory framework for agency rulemaking procedures by publishing a notice of proposed rulemaking and providing interested persons an opportunity for notice and public comment. 5 U.S.C. § 553.

109.     The DOE has not sought to establish good cause to waive these notice and public comment procedures required under the APA due to these procedural requirements being impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b). As such, the DOE is not exempt from the rulemaking procedures specifically prescribed by statute.

110.     Because the DOE's Cease-and-Desist Letter and subsequent penalties were issued without observance of procedure required by law, the action was unlawful and must be set aside.

111.     As a direct and proximate result of DOE's unlawful action, EGCC has been materially damaged and will continue to incur such damage.

112.     An actual, justiciable controversy exists between EGCC and the DOE for which EGCC has no adequate remedy at law.

113.     Absent injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, EGCC and its students will be immediately, continuously, and irreparably harmed by the DOE's illegal actions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Eastern Gateway Community College, respectfully requests entry of judgment against Defendants Secretary of Education Miguel Cardona and the United States Department of Education on all claims asserted, for injunctive and declaratory relief declaring unlawful and enjoining the DOE's Cease-and-Desist Letter and subsequent enforcement actions, including the HCM2 status and teach-out requirement, and for such violation as demands an award of compensatory damages, punitive damages including statutory penalties as provided by law, the costs of this action and attorneys' fees, and any further relief that this Court believes just and equitable.

*/s/ Adam D. Fuller*
Justin M. Alaburda (#0082139)
Victoria L. Ferrise (#0085012)
Adam D. Fuller (#0076431)
BRENNAN, MANNA & DIAMOND, LLC
75 East Market Street
Akron, OH 44308
Ph: (330) 253-5060 / Fax: (330) 253-1977
jmalaburda@bmdllc.com
vlferrise@bmdllc.com
adfuller@bmdllc.com

Marlon A. Primes (#0043982)
Abigail E. Peabody (#0099804)
BRENNAN, MANNA & DIAMOND, LLC
200 Public Square
Huntington Building, Suite 3270
Cleveland, OH 44114
Ph: (216) 658-2155 / Fax: (216) 658-2156
maprimes@bmdllc.com
aepeabody@bmdllc.com

Bonnie Little Graham (PHV pending)
Maddie Cleghorn (PHV pending)
Brustein & Manasevit, PLLC
1023 15th Street NW, Suite 500
Washington, DC 20005
Ph: (202) 965-3652 / Fax: (202) 965-8913
bgraham@bruman.com
mcleghorn@bruman.com

***Special Counsel for Plaintiff Eastern Gateway
Community College***

## JURY DEMAND

Plaintiff Eastern Gateway Community College hereby demands trial by jury on all claims stated herein so triable.

*/s/ Adam D. Fuller*

***Special Counsel for Plaintiff Eastern
Gateway Community College***

4878-1585-5409, v. 1

26