## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| EASTERN GATEWAY COMMUNITY COLLEGE )<br><br>Plaintiff, )<br><br>v. )<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION )<br><br>Defendants. ) | Civil Action No. 3:22-cv-03326-EAS |

## DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Defendants Miguel Cardona and the United States Department of Education hereby move to dismiss Plaintiff's Complaint for lack of Subject Matter Jurisdiction, and Oppose Plaintiff's Motion for Preliminary Injunction. *See* ECF No. 4. The grounds for this Motion and Opposition are set forth in detail in the accompanying Memorandum in Support.

Dated: September 20, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

s/ Alexander N. Ely
ALEXANDER N. ELY
Trial Attorney
United States Department of Justice

Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005
Tel: (202) 993-5177; Fax: (202) 616-8470
alexander.n.ely@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
| EASTERN GATEWAY COMMUNITY COLLEGE | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:22-cv-03326-EAS |
| | ) | |
| v. | ) | |
| | ) | |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, and UNITED STATES DEPARTMENT OF EDUCATION | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF JURISDICTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## COMBINED TABLE OF CONTENTS & AUTHORITIES

INTRODUCTION.................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND .............................................................3

      A.      The Higher Education Act & Title IV ................................................................3

            20 C.F.R. § 690
            20 U.S.C. § 1001(a)(5)
            20 U.S.C. § 1070
            20 U.S.C. § 1087ll
            20 U.S.C. § 1094(a)
            20 U.S.C. § 1099c(d)
            20 U.S.C. § 1226a-1
            34 C.F.R. § 600.4(a)(5)
            34 C.F.R. § 668.14
            34 C.F.R. § 668.16
            34 C.F.R. § 668.162
            34 C.F.R. § 668.163
            34 C.F.R. § 690.12
            34 C.F.R. § 690.13
            2021-2022 Student Financial Aid Handbook, Vol. 3 (2022)
            *Higher Education Act of 1965*, Pub. L. No. 89-329, 79 Stat. 1219 (1965)

      B.      EGCC's Nationwide Online Program and Consulting Agreement With
            SRC........................................................................................................................5

            20 U.S.C. § 1001(a)(5)
            20 U.S.C. § 1099b
             34 C.F.R. § 602.1
            Ohio Rev. Code § 3354
            Ohio Rev. Code. § 3354.01(c)
            Ohio Rev. Code § 3354.24(b)
            *Student Res. Ctr. v. E. Gateway Cmty. Coll.*, No. 2:22-CV-2653, 2022 WL
            2666730 (S.D. Ohio July 11, 2022)

      C.      The Department of Education's Program Review at EGCC and
            Subsequent Administrative Actions ...................................................................9

            20 U.S.C. § 1087ll
            34 C.F.R. § 600.2

      D.      This Litigation ..................................................................................................13

STANDARD OF REVIEW ...............................................................................................14

      *Aarti Hosp., LLC v. City of Grove City*, 486 F. Supp. 2d 696 (S.D. Ohio 2007)
      *Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000)
      *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453 (6th Cir. 1997)
      *Metro Hydroelec. Co. v. Metro Parks*, 541 F.3d 605 (6th Cir. 2008)
      *Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005)

*Munaf v. Geren*, 553 U.S. 674 (2008)
*Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)
*O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009)
*Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383 (6th Cir. 2016)
*United States v. Glover*, 242 F.3d 333 (6th Cir. 2001)
*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994)
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)

ARGUMENT .................................................................................. 15

I.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER EGCC'S
     CLAIMS ................................................................................. 16

*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)
*Baker v. Carr*, 369 U.S. 186 (1962)
*Gaetano v. United States*, 994 F.3d 501 (6th Cir. 2021)
*Gill v. Whitford*, 138 S. Ct. 1916 (2018)
*Kontrick v. Ryan*, 540 U.S. 443 (2004)
*LaMarca v. United States*, 34 F. Supp. 3d 796 (N.D. Ohio 2014)
*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)
*Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016)
*Whittle v. United States*, 7 F.3d 1259 (6th Cir. 1993)

     A.   Heightened Cash Monitoring Status is Committed to Agency Discretion
          by Law, Precluding Review Under the APA ....................................... 17

          5 U.S.C. § 701(a)(2)
          20 U.S.C. § 1226a-1
          34 C.F.R. § 668.162
          *Bowling Green Jr. Coll. v. U.S. Dep't of Educ.*, 687 F. Supp. 293 (W.D. Ky.
             1988)
          *Heckler v. Chaney*, 470 U.S. 821 (1985)
          *Instituto de Educacion Universal Corp. v. Riley*, 973 F. Supp. 95 (D.P.R. 1997)
          *Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99 (1st Cir. 2015)
          *Lincoln v. Vigil*, 508 U.S. 182 (1993)
          *Webster v. Doe*, 486 U.S. 592 (1988)

     B.   Because EGCC Cannot Meet The Requirements of HCM2, Declaratory or
          Injunctive Relief Against the Cease and Desist Letter Would Not Redress
          EGCC's Alleged Injuries, and It Therefore Lacks Standing ............................ 19

          *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410 (6th
             Cir. 2021)
          *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)
          *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands,
             LLC*, 713 F.3d 175 (4th Cir. 2013)
          *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)
          *WTGD 105.1 FM v. SoundExchange, Inc.*, No. 5:14-CV-00015, 2014 WL
             12819789 (W.D. Va. Sept. 12, 2014)

II.  EGCC IS NOT LIKELY TO SUCCEED ON THE MERITS ........................................ 22

A.    The Cease-and-Desist Letter Is Not Final Agency Action As Required to State a Claim Under the APA ......................................................................... 22

      5 U.S.C. § 704
      34 C.F.R. §§ 668.111–24
      *Allsteel, Inc. v. U.S. E.P.A.*, 25 F.3d 312 (6th Cir. 1994)
      *Am. Bar Ass'n v. United States Dep't of Educ.*, 370 F.Supp.3d 1 (D.D.C. 2019)
      *Bennett v. Spear*, 520 U.S. 154 (1997)
      *LaMarca v. United States*, 34 F. Supp. 3d 796 (N.D. Ohio 2014)
      *St. Catharine Coll., Inc. v. King*, No. 3:16-CV-00113-GNS, 2017 WL 1097205
        (W.D. Ky. Mar. 22, 2017)
      *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016)

B.    The Department's Position in the Cease-and-Desist Letter Does Not Constitute a Limitation, Suspension, or Termination Under 20 U.S.C. §1094(c)(1)(F) and the Applicable Regulations ................................................ 26

      20 U.S.C. §1094(c)(1)(F)
      34 C.F.R. § 668.86(b)

      1.    The Cease-and-Desist Letter is Not a "Limitation" and the Department's Actions Were Consistent with the HEA and Regulations .......................................................................................... 27

            34 C.F.R. § 668.94
            *Auer v. Robbins*, 519 U.S. 452 (1997)
            *Bowling Green Jr. Coll. v. U.S. Dep't of Educ.*, 687 F. Supp. 293 (W.D.
              Ky. 1988)
            *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)
            *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust*, 410 F.3d 304 (6th Cir. 2005)
            *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)

      2.    Subsequent Dealings Between the Parties Reinforce that EGCC Has Not Suffered a Limitation on its Ability to Participate in the Pell Grant Program ............................................................................. 29

C.    EGCC Mischaracterizes the Nature of the Department's Teachout Request, Which is Not Mandatory And Thus Not Subject to Section 1094 ........ 30

      20 U.S.C. § 1094(f)
      *Caruso Tr. for ITT Educ. Servs. Inc. v. Modany*, No.
        118CV02182JPHTAB, 2022 WL 2305693 (S.D. Ind. June 27, 2022)

D.    The Department's Determination in the Cease-and-Desist Letter Is Not Arbitrary and Capricious ............................................................................... 32

      20 U.S.C. § 1087ll
      *In re Marriage of Larsen*, 912 N.W.2d 444 (Iowa 2018)
      *Noerand v. Devos*, 474 F. Supp. 3d 394 (D. Mass. 2020)
      *Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020)

III.    THE REMAINING PRELIMINARY INJUNCTION FACTORS COUNSEL
        IN FAVOR OF DENYING RELIEF..................................................................34

        11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE CIV. §
          2948.1 (2d ed.)
        *Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006)
        *Livonia Properties Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC*,
          399 F. App'x 97 (6th Cir. 2010)
        *R.K. v. Lee*, 563 F. Supp. 3d 774 (M.D. Tenn. 2021)
        *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020)

CONCLUSION ...................................................................................................................36

## INTRODUCTION

In the course of a broader program review brought about by serious concerns over mismanagement and inadequate record-keeping at Eastern Gateway Community College ("EGCC")—including the fact that EGCC had been placed on probation by its accreditation agency for a host of deficiencies—the Department of Education discovered that as part of its nationwide, online learning program, EGCC was writing off all tuition costs and fees for students that were not eligible for Pell Grants under Title IV of the Higher Education Act, and using federal money from students who *were* eligible for Title IV funds to subsidize the rest of the program. The Department concluded that what EGCC called its Free College Benefit Program violated Title IV's prohibition on disparate treatment because it assessed Pell Grant recipients the costs of tuition and fees, while it did not assess those tuition and fees to non-Title IV students.  Rather than await the issuance of the final program review report, the Department—in an effort to encourage EGCC to fix the problem and to avoid incurring additional liability until the program review concluded— sent a cease-and-desist letter to EGCC on July 18, 2022, explaining the Department's view that the Free College Benefit Program, as constituted, violates Title IV, and providing instructions for EGCC to take corrective action to bring the program into compliance.

Notwithstanding this ongoing process, EGCC elected to file suit under the Administrative Procedure Act ("APA") and now seeks to enjoin the cease-and-desist letter. The Court should reject this effort, for several reasons.  First, the Court lacks subject matter jurisdiction over EGCC's claims because one of the actions taken by the Department from which EGCC claims to have suffered injury—the school's placement on the Heightened Cash Monitoring 2 ("HCM2") method of payment for Title IV funds—is committed to agency discretion by law and thus is unreviewable. Additionally, EGCC has thus far not submitted a  request for reimbursement under the HCM2

framework, and appears to lack the ability to comply with the documentation and other requirements of HCM2. *See* Declaration of Jeremy Early, Ed.D ("Early Decl.") (attached as Exhibit 1). Because EGCC would likely be unable to access Title IV funds in any event even if the cease-and-desist letter were enjoined, it is wholly speculative whether injunctive relief directed at the cease-and-desist letter would redress EGCC's injuries. EGCC thus lacks standing to challenge the cease-and-desist letter.

Should the Court conclude that it has jurisdiction, EGCC's Motion for a Preliminary Injunction ("Pl.'s Mot.") should be denied on the merits. EGCC is not likely to succeed on the merits for several reasons. The cease-and-desist letter is not final agency action as required to state a claim under the APA; the cease-and-desist letter is not a limitation on EGCC's participation in Title IV; and the Department's determination that EGCC's Free College Benefit Program, as currently structured, violates Title IV is not arbitrary and capricious under the APA.

Nor has EGCC established the requisite irreparable harm necessary for extraordinary injunctive relief. Students are in classes at EGCC this semester, and the Department specifically informed EGCC that notwithstanding its concerns about the program, students enrolled at EGCC in the Free College Benefit Program prior to the date of the cease-and-desist letter could continue to access Pell funds through the end of the Fall semester while the parties continue to engage in discussions about EGCC's proposal to redesign the program to bring it into compliance with Title IV. EGCC's claim to have suffered irreparable harm also fails because it was EGCC itself that disclosed the existence of the Department's program review and the cease-and-desist letter, and a party cannot manufacture irreparable harm through "self-inflicted" harm. The balance of equities and the public interest also tilt decisively against awarding relief.

The Court should either dismiss this lawsuit for lack of jurisdiction or, if it finds that

jurisdiction exists, deny EGCC's motion for preliminary injunction.

## LEGAL AND PROCEDURAL BACKGROUND

### A.     The Higher Education Act & Title IV

Under Title IV of the Higher Education Act of 1965 ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219, Congress established various student loan and grant programs, including the Federal Pell Grant Program. *See* 20 U.S.C. § 1070 *et seq.*; 34 C.F.R. § 690.  Under the Pell Grant program, the student initiates the process with an application to the Department of Education ("DOE" or "the Department") to have his or her expected family contribution calculated. *See* 34 C.F.R. 690.12(a). The student either sends the application directly to the Department, or provides it to a school for the school to transmit it to DOE on the student's behalf. *Id.* § 690.12(b).  DOE sends the student's application information and expected family contribution to the student and sends each school designated by the student an Institutional Student Information Record ("ISIR") for that student. *Id.* § 690.13.  Assuming a school's request for funds is consistent with information DOE has, the agency transfers funds electronically to a bank account established by the school for holding the Title IV funds it receives for all the federal student aid programs in which it participates. 34 C.F.R. §§ 668.162(b), 668.163.

Although the mechanism by which Title IV funds are disbursed to eligible schools varies depending on the precise program, each—including the Pell Grant Program—requires compliance with specific conditions as a prerequisite to obtaining federal funds. To become eligible to receive Title IV funds, or to have its students receive funds, under these programs, a school must first enter into a program participation agreement with DOE which "shall condition the initial and continuing eligibility of [an institution] to participate in a program upon compliance with" specific requirements. 20 § U.S.C. 1094(a). *See also* 34 C.F.R. § 668.14.  Qualifying Institutions of Higher Education ("IHEs") must also acquire and maintain an active accreditation from a nationally-

recognized accreditation agency. *See* 20 U.S.C. § 1001(a)(5); 34 C.F.R. § 600.4(a)(5). Along with demonstrating financial responsibility, an institution must demonstrate its ability to properly administer the Title IV programs in which it participates. Administrative capability focuses on the processes, procedures, and personnel used in administering Title IV funds and indicators of student success. 20 U.S.C. § 1099c(d); 34 C.F.R. § 668.16.

Title IV makes clear that when establishing the tuition and fee component for Title IV recipients, an institution must use an amount that is "normally assessed a student carrying the same academic workload." 20 U.S.C. §§ 1087ll (cost of attendance). In implementing this statutory provision, the Department has consistently stated that a recipient of Title IV assistance cannot be assessed charges that are higher than what is charged to a student not receiving Title IV aid. *See* 2021-2022 Student Financial Aid Handbook, Vol. 3 at 38 (Sept. 30, 2021) ("In establishing the tuition and fees component of Title IV applicants, you must use an amount that is required for all students in the same course of study . . . a recipient of Title IV aid cannot be assessed charges that are higher than what is charged to a student not receiving aid under the Title IV programs.")[1]

The HEA also vests sole discretion in the Secretary with respect to the mechanics of how Title IV funds are provided to an institution. *See* 20 U.S.C. § 1226a-1 ("Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement, with necessary adjustments on account of overpayments or underpayments, *as the Secretary may determine*.") (emphasis added). *See also* 34 C.F.R. § 668.162(a) ("The Secretary has sole discretion to determine the method under which the Secretary provides title IV, HEA program funds to an institution. In accordance with procedures established

---

[1]    *Available     at:*     https://fsapartners.ed.gov/sites/default/files/2022-2023/2022-2023_Federal_Student_Aid_Handbook/_knowledge-center_fsa-handbook_2022-2023_vol3.pdf

by the Secretary, the Secretary may provide funds to an institution under the advance payment method, reimbursement payment method, or heightened cash monitoring payment method.").

The Subpart K regulations, which govern cash management and payment issues under the student assistance programs, generally provide for three possible methods of payment and reimbursement: the Advance payment method, the Reimbursement payment method, and the Heightened cash monitoring payment method. *See* 34 C.F.R. § 668.162 (b)-(d) (explaining different payment methods and obligations imposed on recipients when they are assigned to one method or another). Under the Advance payment method, "an institution submits a request for funds to the Secretary" and "[i]f the Secretary accepts that request, the Secretary initiates an EFT [electronic funds transfer] of that amount to the depository account designated by the institution." 34 C.F.R. § 668.162 (b). Under the Reimbursement method, "an institution must credit a student's ledger account for the amount of title IV, HEA program funds that the student or parent is eligible to receive, and pay the amount of any credit balance due under § 668.164(h), before the institution seeks reimbursement from the Secretary for those disbursements." *Id.* § 668.162(c). Finally, under Heightened Cash Monitoring an institution "must pay the amount of any credit balance due" before requesting reimbursement, as in the Reimbursement method, but is also subject to heightened documentation requirements. *Id.* § 668.162(d).

## B. EGCC's Nationwide Online Program and Consulting Agreement With SRC

Plaintiff Eastern Gateway Community College is a two-year community college, incorporated under the laws of the State of Ohio, *see* Ohio Revised Code § 3354 *et seq.*, and is a political subdivision of the State. Compl. ¶ 8, ECF No. 1. EGCC operates community college branches in Steubenville and Youngstown, Ohio. *Id.* Under the applicable Ohio Code provision defining "community college," EGCC is a "public institution of education beyond the high school organized for the principal purpose of providing for the people of the community college district

wherein such college is situated" certain types of instructional programs. *See* Ohio Revised Code. § 3354.01(C) (Sept. 30, 2021). Under the specific statutory provision defining the Eastern Gateway district, the community college district comprises "two taxing subdistricts, one consisting of the territory of Jefferson county, and the other consisting of the territories of Columbiana, Mahoning, and Trumbull counties." *Id.* § 3354.24(B).

Beginning in or around 2016, EGCC underwent a dramatic growth in enrollment by expanding beyond Ohio to offer online learning to individuals across the country. Much of this nationwide expansion was driven by a Collaboration Agreement that EGCC entered into in 2017 with Student Resource Center ("SRC"), a private educational services company that provided consulting services. *See Student Res. Ctr. v. E. Gateway Cmty. Coll.,* No. 2:22-CV-2653, 2022 WL 2666730, at *1 (S.D. Ohio July 11, 2022). "SRC's main services under the Agreement are to interface with unions, field inquiries from union members, advise those members on course enrollment (in conjunction with EGCC staff), and assist them with the admissions process." *Id.* Moreover, "any revenue, including tuition, generated by SRC activities are placed into the Collaboration Account, from which both parties are reimbursed for any operating expenses and compensated with any funds that remain, with SRC receiving 50% of any surplus." *See* Answer and Counterclaims, ¶ 12, *Student Resource Center v. Eastern Gateway Community College,* No. 22-cv-02653 (S.D. Ohio Sept. 12, 2022), ECF No. 24 (attaching contract). As a result of this contractual arrangement, union-affiliated student enrollment at EGCC exploded from 5,500 enrollees before the Agreement "to upwards of 40,000 in fall semester 2021." *Student Resource Center*, 2022 WL 266730 at *1.

Thus, as explained in a Letter from EGCC's accreditation agency, Higher Learning Commission (HLC)—in which the accreditor placed EGCC on probation for systemic violations—

what began as a local community college serving four counties in Southern Ohio had by 2021 morphed into a nationwide online learning platform, with enrollment driven by a private consulting business under a contractual arrangement with EGCC.  *See* Letter from Barbara Gellman-Danley to Michael Geoghegan, Nov. 8, 2021, https://www.hlcommission.org/download/_BoardActionLetters/HLC%20Action%20Letter%20-%20Eastern%20Gateway%20Community%20College%2011.8.21.pdf ("HLC Probation Letter") (attached as Exhibit 2) ("The Institution has experienced significant enrollment growth over the past four years, expanding from 8,530 students in fall 2017 to 38,613 students by fall 2020 . . . Online enrollment constitutes approximately 90% of the student population according to institutional reports.")  At least outwardly, these students' enrollment and tuition costs were "funded" by EGCC's Free College Benefit program, which purported to provide "scholarships" to cover the cost of tuition, fees, and books: for Pell Grant-eligible students, the program purported to provide scholarship money to cover the delta between the overall costs of attendance and the amount disbursed to the student through the Pell Program; for students that did not meet the eligibility requirements under the Pell Program, a scholarship purportedly was made available to cover the entire cost of attendance. *See* Pl.s' Mot. Ex. 1; *see also* Compl. ¶ 14-15 (describing the model as one in which "an entity" will pay "any tuition remaining . . . after a student's existing federal financial aid award is used" and "the remaining balance" on a student's account after the disbursement of grants and state aid "is covered by a last-dollar scholarship through tuition waivers under the Program.").

However, as detailed *infra* Section I.C, a Department investigation and ongoing program review found that EGCC was "merely waiving/writing off all non-Pell" grant charges (and grants from state sources) "on student accounts, and falsely making it appear that the students are being

funded by outside entities." Pl.'s Mot. Ex. 1, at 1.  The outside entities that were purportedly the source of the last-dollar scholarship program in fact "provide[d] virtually no funds," *id.*, in effect creating a situation where Pell Grants were subsidizing the entire cost of the program and serving as EGCC's principal source of funding for all operational expenses. *See* Pl.'s Mot. Ex. A (Geoghegan Decl. ¶ 14) ("Pell funds account for approximately 74.5% of EGCC's overall revenue."); *id.* ¶ 35 (describing "Pell Grants and state subsidies" as "the primary sources of EGCC's funding"); Pl's Mot. Ex. 6 at 2 ("Although EGCC maintains there is a scholarship being applied, the Department has determined that there are virtually no funds being provided by any sources outside of Title IV. *Title IV funds are essentially funding the 'free tuition' for non-Title IV students*.") (emphasis added).  In essence, the expansion of union-affiliated student enrollment allowed EGCC to draw on increased Pell Funds, which both subsidized non-Pell students (who were not assessed any costs) and helped defray other costs and expenses, including presumably payments to SRC, EGCC's private consultant.  However, as the Department concluded, "the Free College Benefit [Program] put EGCC in a very precarious financial position because the funds needed to actually educate students are severely limited forcing EGCC to drastically cut its academic and operating expenses." Pl.'s Mot. Ex. 1 at 2.

On November 8, 2021, the Higher Learning Commission—EGCC's accreditation agency[2]—placed EGCC on Probation for failure to comply with the applicable criteria for accreditation. *See* Ex. 2 (HLC Letter).  Among other deficiencies, HLC noted that the EGCC had

---

[2] Under the HEA, one of the requirements of an eligible Institution of Higher Education is that it be "accredited by a nationally recognized accrediting agency or association." 20 U.S.C. § 1001(a)(5). The Department of Education's primary role in the accreditation process is to recognize an accrediting agency as a "reliable authority regarding the quality of education or training offered" at qualifying IHE's through the processes and conditions set forth in the HEA and federal regulations. *See* 20 U.S.C. §1099b(a); 34 C.F.R. §602.1.

not demonstrated that it had the faculty and staff needed for effective, high-quality programs and student services," *id.* at 3; noted that "online enrollment [at EGCC] constitutes approximately 90% of the student population according to institutional reports," *id.* at 3-4; that "the ability for students to receive adequate, timely advising has been uneven" and that "online students reported that no placement tests are required [before] they meet with their academic advisors," *id.* at 4; that "several academic programs lack full-time faculty," *id.* at 5; and that the "Institution has not conducted ongoing, regular reviews of courses, cocurricular programs or general education outcomes." *Id.* at 6. Further, HLC noted that "With the goal of 100,000 students by 2025, the Institution has not used its substantial financial base to proactively develop a resource and deployment plan that outlines a scalable model of services to support the expanding population. In several instances, evaluation of and modifications to operations is lagging behind the rapid enrollment growth pattern." *Id.* at 8. The HLC Letter required that EGCC "host a comprehensive evaluation no later than April 2023 to determine whether the Institution has ameliorated the findings that led to the imposition of the sanction." *Id.* at 1.

### C. The Department of Education's Program Review at EGCC and Subsequent Administrative Actions

In February of 2022, the Department of Education began an off-site Program Review at EGCC to evaluate the institution's compliance with Title IV and to determine whether EGCC students met the eligibility requirements under the Pell Grant program. This comprehensive program review at EGCC is ongoing, but has thus far included an evaluation of the school's academic progress standards, general accounting practices, enrollment records (including the school's ability to track when students have left the program mid-semester and whether unused Pell Funds for those students have been returned to the Department of Education as required), training and qualifications of staff—including their training, experience, and familiarity with Tile

IV funding and payment practices—and whether certain employees of EGCC were simultaneously on the payroll of EGCC's private servicer. *See* Pl.'s Mot. Ex. 7 at 1.

In the course of this program review the Department evaluated the structure and financing model for the school's Free College Benefit Program. The Department determined that EGCC was writing off all tuition costs for non-Title IV-eligible students but collecting tuition payment in the form of Pell Grants on behalf of students that were Title IV-eligible. The Department therefore concluded that the structure of the Free College Benefit Program did not comply with Title IV's requirement that, when establishing tuition and fees for Title IV recipients, an institution must use an amount that is "normally assessed a student carrying the same academic workload[.]" 20 U.S.C. §§ 1087*ll*(1) (cost of attendance). Because the Free College Benefit Program was treating Title-IV eligible students differently from other students—by charging them tuition in the form of Pell Grants, rather than charging them nothing at all, as it was other students—the structure of the program violated the Department's "longstanding policy" which "prohibit[s] institutions from assessing charges to a student receiving aid under the Title IV programs that are greater than what is charged to a student not receiving such aid." Pl.'s Mot. Ex. 6, at 1.

In an effort to prevent EGCC from incurring additional liability or dealing with future clawbacks of federal funds while the Department's program review was continuing, the Department communicated its view that the Free College Benefit Program violated Title IV on July 18, 2022 (the cease-and-desist letter). The Letter summarized the Department's initial determination of EGCC's program as follows:

> All students enrolled at EGCC under the Free College Benefit Program are charged for tuition, fees, and books. Students who receive Federal Pell Grant (Pell) funds have their Pell disbursements credited to their accounts to reduce total charges. The remainder of the charges are then reduced to zero by applying some form of "scholarship" to the remaining balance. If a student also received a state grant, the "scholarship" was applied after both Pell and the state grant funds. Students who

> do not receive Pell/state grant funds, have their entire tuition, fee and book charges reduced to zero. The notations on student ledger cards make it appear that there is truly a "scholarship" being funded by one of many outside entities. The Department has determined that outside entities provide virtually no funds. EGCC is merely waiving/writing off all non-Pell/state grant charges on student accounts, and falsely making it appear that the students are being funded by outside entities. Essentially, under this program, students who receive Pell funding are being charged for the program, but students not receiving Pell are not. This is in direct violation of the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq. (Title IV).

Pl.'s Mot. Ex. 1, at 1. The letter further explained that other allegedly comparable programs at other schools that EGCC cited are "funded by an actual income source, whether it be from the institution's Foundation or the State, and those funds are used for qualifying students. In none of the programs are charges for non-Title IV students written off entirely, resulting in Title IV students being charged and non-Title IV students not, a result that is prohibited under the Title IV Statute." *Id.* at 2.

Because the *only* tuition payments the school was receiving were in the form of Pell Grants for the students who qualified for such aid, as the Department noted in subsequent correspondence to EGCC, "Title IV funds are essentially funding the 'free tuition' for non-Title IV students." Pl.'s Mot. Ex. 6, at 2. Given the discrepancies in terms of which categories of students were being assessed tuition charges and fees, the Department informed EGCC in the cease-and-desist letter that, "as currently implemented[,]" the Free College Benefit Program "violates the Title IV prohibition against assessing charges to Title IV recipients that are higher than those charges assessed to non-Title IV recipients." Pl.'s Mot., Ex. 1 at 1. The Department explained that "EGCC must not disburse Pell funds to any new students enrolling the Free College Benefit Program until it is redesigned to charge full tuition and fees to all non-Pell eligible students. To accomplish this, "EGCC must cease waiving the tuition and fees for non-Pell students." Pl.'s Mot., Ex. 1 at 2. The Letter also indicates that "the Department will provide directives regarding currently enrolled

students shortly" and invited EGCC to assist with this process by providing additional documentation. *Id.*

On August 8, 2022, the Department informed EGCC that it had elected to transfer the college from the Advance payment method for receiving Pell Grants to the Heightened Cash Monitoring 2 ("HCM2") method of payment effective that same day. *See* Pl.'s Mot., Ex. 7. As the Department explained to EGCC in that letter, "[i]n addition to the issues previously raised regarding the financing model of the Free College Benefit Program, the Department has identified other concerns that call into question EGCC's ability to properly administer the Title IV programs and its ability to act in the capacity of a fiduciary." *Id.* at 1. Specifically, the Department noted that EGCC appeared to be "unable to reconcile its Title IV drawdowns to individual student accounts for the period under review, meaning that the school cannot properly document that specific students were the beneficiaries of Title IV assistance received by the institution;" that the school's "general accounting records contain serious discrepancies;" that "EGCC has inadequate internal controls, including employees in key roles who were being paid by both the institution and its servicer, an unusually high turnover of staff, and a clear lack of training and/or experience of individuals involved in various Title IV functions"; and finally that "inconsistencies in the data and documents provided to the Department have raised concerns regarding EGCC's compliance with Title IV student eligibility requirements, satisfactory academic progress standards, and Title IV return requirements." *Id.*

The August 8th letter made clear that under the HCM2 payment method, "EGCC may continue to obligate funds under the federal student financial assistance programs authorized by Title IV of the Higher Education Act of 1965, as amended. EGCC may disburse institutional funds to eligible students. If EGCC disburses institutional funds, the U.S. Department of Education

(Department) will reimburse it for properly documented expenditures." *Id.* at 2. The letter attached a detailed set of "Instructions for Obtaining Funds Under Heightened Cash Monitoring (HCM2) Method of Payment." *Id.* at 4-12.  Thus far, the Department has not received a specific response to this letter, nor has EGCC taken any apparent steps to provide the required documentation for HCM2 or to establish the necessary internal processes for doing so.

On August 10, 2022, the Department requested that EGCC enter into discussions with other academic institutions to establish a "teach-out agreement" whereby, if EGCC were forced to shut down operations, its students would be able to quickly resume their course load at another institution. Pl.'s Mot., Ex. 8.  While recognizing that HLC had already requested that EGCC enter into a teach-out plan as part of its probation sanction, *see id.*, the Department conveyed its views to EGCC that a teach-out agreement with other schools would be "in the best interests of students" given "the ongoing issues regarding funding of the Free College Benefit Program, the Department's transfer of Eastern Gateway Community College (EGCC) to the Heightened Cash Monitoring 2 (HCM2) method of payment, and the probation action initiated by the institution's accreditor."[3]  *Id.*  The Department requested that EGCC provide a teach-out agreement within 30 days (by September 10), which it has not yet received as of the date of this filing.

---

[3] A teach-out plan is "[a] written plan developed by an institution that provides for the equitable treatment of students if an institution, or an institutional location that provides 100 percent of at least one program, ceases to operate or plans to cease operations before all enrolled students have completed their program of study." *See* 34 C.F.R. § 600.2. A teach-out agreement, by contrast, is "[a] written agreement between institutions that provides for the equitable treatment of students and a reasonable opportunity for students to complete their program of study if an institution, or an institutional location that provides 100 percent of at least one program offered, ceases to operate or plans to cease operations before all enrolled students have completed their program of study." *Id.*

13

### D.    This Litigation

Despite the ongoing program review and dialogue between the parties, EGCC filed the instant lawsuit on September 2, 2022. *See* Compl., ECF No. 1. The Complaint alleges that the Department's cease-and-desist letter and "subsequent enforcement actions" were issued in violation of the Administrative Procedure Act, and that the Department's actions violated EGCC's rights to due process under the APA and the Constitution. The Complaint seeks declaratory and injunctive relief, including an order setting aside the cease-and-desist letter.

EGCC filed the instant Motion for Preliminary Injunction ("Pl.'s Mot.") on September 6, 2022. *See* ECF No. 4. The Motion seeks a Preliminary Injunction "enjoining DOE from enforcing its Cease-and-Desist Letter and its subsequent enforcement actions derived from the Cease-and-Desist Letter, including but not limited to EGCC's placement on HCM2 status and DOE's demand that EGCC enter into a teach-out agreement." Pl.'s Mot. at 2.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal if the court lacks subject matter jurisdiction. "[F]ederal courts are courts of limited jurisdiction," *United States v. Glover*, 242 F.3d 333, 335 (6th Cir. 2001), and "'it is to be presumed that a cause lies outside this limited jurisdiction[.]'" *Metro Hydroelec. Co., LLC v. Metro Parks*, 541 F.3d 605, 610 (6th Cir. 2008) (citation omitted). "For the purpose of determining whether to grant a motion to dismiss made pursuant to a claim of lack of jurisdiction, [p]laintiffs bear the burden of proving jurisdiction." *Aarti Hosp., LLC v. City of Grove City*, 486 F. Supp. 2d 696, 698 (S.D. Ohio 2007). Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction "fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A facial attack is a challenge to the sufficiency of the pleading itself," whereas "[a] factual attack challenges 'the factual existence of subject matter jurisdiction.'" *Id.*

Here, Defendants advance both challenges.  First, Defendants bring a facial challenge to EGCC's Complaint insofar as it alleges harm from EGCC's placement on HCM2, which is committed to agency discretion by law and thus not reviewable under the APA.  Second, Defendants bring a factual challenge to EGCC's standing to challenge the Department's position as articulated in the July 18 letter.  In both cases, when evaluating a defendant's Rule 12(b)(1) motion, one thing remains true: "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice" to defeat it. *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)); *accord Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016).

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("[T]he preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.") (citation omitted).  A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012).  While a strong likelihood of success is crucial, all four factors must be balanced rather than treated as prerequisites. *See McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).  Irreparable

harm also is of great importance: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

**ARGUMENT**

The Court should dismiss EGCC's claims for lack of subject matter jurisdiction under Rule 12(b)(1). Should the Court conclude that it has jurisdiction, EGCC's Motion for Preliminary Injunction should be denied.

## I. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER EGCC'S CLAIMS

"The objection that a federal court lacks subject-matter jurisdiction, *see* Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006). Moreover, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *See Kontrick v. Ryan,* 540 U.S. 443, 455 (2004). "Without a statutory waiver of the United States' sovereign immunity, subject-matter jurisdiction cannot obtain." *Gaetano v. United States*, 994 F.3d 501, 503 (6th Cir. 2021); *see also LaMarca v. United States*, 34 F. Supp. 3d 796, 804 (N.D. Ohio 2014) ("The sovereign immunity of the United States extends to federal agencies, which are immune from suit absent a waiver of sovereign immunity.") (citing *Whittle v. U.S.,* 7 F.3d 1259, 1262 (6th Cir. 1993)).

Additionally, EGCC cannot invoke the jurisdiction of the Court unless it "can show 'a personal stake in the outcome of the controversy.'" *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). *See also Phillips v. DeWine*, 841 F.3d 405, 414 (6th Cir. 2016) ("Article III, Section 2 of the Constitution provides that federal courts may hear and resolve only 'Cases' and 'Controversies.' As a result, 'a plaintiff must demonstrate

standing for each claim he seeks to press.'") (cleaned up).  At its "irreducible constitutional minimum," the standing doctrine requires satisfaction of three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendant's challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Here, the Court lacks jurisdiction over EGCC's claims because HCM2 status is committed to agency discretion by law, and because EGCC cannot demonstrate that it can comply with the requirements of HCM2, the college could not access Pell Grant funds for its students even if the cease-and-desist letter were withdrawn, meaning that injunctive relief against that letter would not redress EGCC's alleged injuries.

### A. Heightened Cash Monitoring Status is Committed to Agency Discretion by Law, Precluding Review Under the APA.

The waiver of sovereign immunity in Section 702 of the APA does not apply, and thus courts lack jurisdiction to hear an APA claim, where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  An agency decision is committed to its "discretion," and is therefore unreviewable, "where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Webster v. Doe*, 486 U.S. 592, 599–600 (1988)).  Such circumstances may arise where the agency's decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler v. Chaney*, 470 U.S. 821 (1985).

Here, the decision whether to place an eligible Institution of Higher Education on the heightened cash monitoring payment method is entirely within the discretion of the Secretary, and

thus the Court lacks jurisdiction over EGCC's claims insofar as they challenge that decision. *See* Compl. ¶ 52 (Count I, § 702 APA claim challenging "subsequent enforcement actions, including the HCM2 status"); *id.* ¶ 70 (Count II, § 706 APA claim, seeking injunction against "the HCM2 status"); *id.* ¶ 88 (Count III, arbitrary-and-capricious claim addressing *inter alia* "the HCM2 status"); *id.* ¶¶ 96, 113 (Counts IV and V, APA and Constitutional due process claims specifically mentioning HCM2 status as a basis for harm). The HEA provides that "Payments pursuant to grants or contracts under any applicable program may be made in installments, and in advance or by way of reimbursement, with necessary adjustments on account of overpayments or underpayments, *as the Secretary may determine*." *See* 20 U.S.C. § 1226a-1 (emphasis added). The HEA implementing regulations, which EGCC does not challenge in this action, provide that "[t]he Secretary has *sole discretion* to determine the method under which the Secretary provides title IV, HEA program funds to an institution. In accordance with procedures established by the Secretary, the Secretary may provide funds to an institution under the advance payment method, reimbursement payment method, or heightened cash monitoring payment method." 34 C.F.R. § 668.162(a). Under Heightened Cash Monitoring, "an institution must credit a student's ledger account for the amount of title IV, HEA program funds that the student or parent is eligible to receive, and pay the amount of any credit balance due under § 668.164(h), before the institution . . . submits a request for funds." *See* 34 C.F.R. § 668.162 (d). The Secretary further has discretion to "modify the documentation requirements and review procedures used to approve" the request. *Id. See also* Pl.'s Mot., Ex. A (Geoghegan Decl. ¶ 27) ("HCM2 requires EGCC to disburse institutional funds to Pell-eligible students prior to requesting and receiving reimbursement from the DOE. As such, EGCC must have institutional funding available to cover initial disbursements

18

to the students enrolled in the Program while it waits for DOE's review and approval of any Pell Grant funds.") (emphasis added).

Consistent with this clear statutory language, courts have found that the Secretary's decision to place a particular institution on Heightened Case Monitoring status (or to assign the institution to another cash payment program) is discretionary. *See Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 114 n. 22 (1st Cir. 2015) ("We note, however, that the DOE has discretion regarding when to place institutions on Heightened Cash Monitoring"); *Instituto de Educacion Universal Corp. v. Riley*, 973 F. Supp. 95, 97 (D.P.R. 1997) ("It is within the Department's discretion to determine the method of providing funds to eligible institutions."); *Bowling Green Jr. Coll. v. U.S. Dep't of Educ.*, 687 F. Supp. 293, 297 (W.D. Ky. 1988) ("Title 20 U.S.C. § 1226a–1 of the General Education Provisions Act clearly grants the Secretary discretion in determining the method of payment. The Secretary is given wide authority in construing the Act's provisions and promulgating regulations thereunder."). In light of the clear statutory and regulatory language, and the common-sense conclusion that overseeing payment and reimbursement structures for federal educational aid programs "involves a complicated balancing of a number of factors" which is "peculiarly within [the Department of Education's] expertise," *Heckler*, 470 U.S. at 821, the statute and regulations here "can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.* at 830 (citation omitted). Nor would courts have any "meaningful standard against which to judge the agency's exercise of discretion" over Title IV payment structures. *See Vigil*, 508 U.S. at 191.

Because the decision to place an institution on Heightened Cash Monitoring is committed to agency discretion by law, EGCC cannot challenge that decision under the APA, and the Court therefore lacks jurisdiction to review that component of EGCC's claim.

**B.** **Because EGCC Has Not Submitted a Request for Reimbursement Under HCM2 and Because Serious Doubts Exist as to Whether EGCC Can Meet the HCM2 Requirements, it is Speculative That Declaratory or Injunctive Relief Against the Cease-and-Desist Letter Would Redress EGCC's Alleged Injuries.**

The school's placement on HCM2 payment status is relevant for a second reason with respect to the Court's jurisdiction, one that disposes of the whole case. EGCC would have to meet the HCM2 requirements in order to receive Pell Grant funds for its students, which EGCC claims the cease-and-desist letter prevents it from obtaining. Injunctive relief setting aside the cease-and-desist letter would therefore only redress EGCC's claimed injuries if EGCC could meet the HCM2 requirements such that it could access Pell funds to begin with. In other words, only by utilizing the HCM2 payment system could EGCC draw down federal Pell Funds. But EGCC has not submitted a claim for reimbursement through the HCM2 process, *see* Ex. 1 (Early Decl. ¶ 6), and given the serious issues identified in the Department's program review with respect to data integrity and record-keeping, it is entirely speculative—and EGCC has not even alleged—that it *could* comply with HCM2. Therefore, injunctive relief against the cease-and-desist letter would not redress EGCC's injuries because it is speculative whether it could access the funds it claims to need and which it claims the letter prevents it from obtaining. "In a nutshell, the redressability requirement obliges a plaintiff fairly to allege that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 417 (6th Cir. 2021) (quoting *Defs. of Wildlife*, 504 U.S. at 560). Simply put, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Here, as a factual matter, EGCC does not even allege in its Complaint that it has systems in place to meet the HCM2 requirement, and the college's precarious financial position and poor system of records renders it unlikely that they could meet the heightened monitoring obligations

as a practical matter.  As EGCC itself notes, HCM2 requires that "EGCC must have institutional funding available to cover initial disbursements to the students enrolled in the Program while it waits for DOE's review and approval of any Pell Grant funds." Pl.'s Mot., Ex. A (Geoghegan Decl. ¶ 27).  EGCC has not responded to the Department's HCM2 letter and does not allege in its Motion or Complaint that it has the institutional systems and personnel in place—nor the cash on hand to cover credit balance payments prior to submitting requests for reimbursement—to meet the heightened reporting and other requirements of HCM2.

As further documented by the Declaration of Dr. Jeremy Early, the ongoing program review at EGCC has shown that EGCC lacks basic bookkeeping and record-keeping systems for financial management and tracking student enrollment and progress. For example, "the Department has an overall concern regarding the integrity of the data provided by the institution and the institution's inability to reconcile its records to establish a clear audit trail for the disbursement of Title IV funds." Ex. 1 (Early Decl. ¶ 8).  EGGC's Learning Management System (LMS) has not been updated to reflect whether students who were enrolled actually completed their course of study: "Although some students had grades on their transcripts for specific classes, there is no academic activity, such as assignments or quizzes, in the LMS system to show the students ever began attendance.  Despite these facts, Title IV funds were paid for the classes." *Id.* ¶ 9(c).  When students receiving Title IV funding did not complete a semester for which Title IV funds had been dispersed, EGCC was unable to provide adequate documentation that they had returned unused funds to the Department.  *Id.* ¶ 9(d).   As the Department explained in its August 8th letter, EGCC "is unable to reconcile its Title IV drawdowns to individual student accounts . . . meaning that the school cannot properly document" which "specific students were the beneficiaries of Title IV assistance" and which were not. Pl.'s Mot., Ex. 7.  If that weren't enough,

HCM2 requires that credit balances be paid prior to requesting reimbursement; however, "[t]he Department has established that Eastern Gateway was not paying credit balances timely, and there are still identified outstanding credit balances that have not been paid." Ex. 1 (Early Decl. ¶¶ 12-13).

In short, even were the Court to order injunctive or declaratory relief from the cease-and-desist letter and find a procedural or substantive APA violation, such relief in all likelihood "would leave plaintiff in exactly the same . . . position," *WTGD 105.1 FM v. SoundExchange, Inc.,* No. 5:14-CV-00015, 2014 WL 12819789, at *12 (W.D. Va. Sept. 12, 2014), meaning that it would not have redressed the injury alleged in the complaint. *See Glennborough Homeowners*, 21 F.4th at 417 (noting that plaintiff's "standing problem remains in that" the relief sought "would do nothing to redress the only injuries cited in its complaint."); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,* 713 F.3d 175, 183 (4th Cir. 2013) (finding that the plaintiffs could not show "redressability" because they would be injured "regardless of the outcome" in their declaratory judgment action).

Because it is speculative whether EGCC can comply with HCM2—and because EGCC has not made any apparent effort to do so, nor submitted a request for reimbursement—the Court cannot order relief that will redress EGCC's injuries. EGCC therefore lacks standing, and the case should be dismissed.

## II.    EGCC IS NOT LIKELY TO SUCCEED ON THE MERITS

Assuming the Court has jurisdiction, EGCC is unlikely to succeed on the merits of its claims, and the Court should deny its Motion for Preliminary Injunction.

A.  **The Cease-and-Desist Letter Is Not Final Agency Action As Required to State a Claim Under the APA.**

As an initial matter, EGCC's APA claims fail because the cease-and-desist letter does not reflect "final agency action," 5 U.S.C. § 704, which is any agency action that is (1) "the consummation of the agency's decisionmaking process" and that (2) also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Agency action that is "merely tentative or interlocutory in nature" is not final agency action. *Id.* at 177-78. Here, the cease-and-desist letter is interlocutory in character—particularly against the backdrop of the broader program review at EGCC—and therefore is not final agency action under the APA, which necessarily defeats EGCC's claims.

*LaMarca v. United States*, 34 F. Supp. 3d 796 (N.D. Ohio 2014), is instructive. In that case, the Department of Education determined that two vocational schools receiving Title IV funding for their students "owed Pell Grant refunds to the DOE for students who dropped out before completing their coursework or who were later determined ineligible for Pell Grant assistance." *Id.* at 798. The Department responded by placing the schools "on a reimbursement format," *id.* at 799, and then the Department "issued its Preliminary Program Review (PPR) for the inspection of the Schools conducted by the DOE earlier in June 2003." *Id.* Most importantly, the preliminary review "advised that Schools that until there was an accounting of refunds owed to the DOE, the Schools were not eligible for Title IV monies." *Id.* at 801. Both of these action— placing the schools on the Reimbursement format and issuing a preliminary program review— appear to have been taken without formal notice and an opportunity to be heard.

The District Court held that this intermediate step—even though it communicated to the school that it could not access Pell Grant funds—was not final agency action. Instead, it was only when the Department issued its *Final Program Review* that the agency's order could be challenged

under the APA. *See id.* at 804 ("In this case under the HEA's statutory scheme, after plaintiffs respond to the PPR and the DOE issues a Final Program Review Determination, that final agency action is subject to judicial review pursuant to the procedures provided in 34 C.F.R. pt. 668, subpt. H; *see* 34 C.F.R. §§ 668.111–24."). In so ruling, the court noted that until the issuance of the Final Program Review, "there is an administrative process available to resolve these issues." *Id.* at 800. Other courts have reached similar conclusions. *See, e.g., St. Catharine Coll., Inc. v. King*, No. 3:16-CV-00113-GNS, 2017 WL 1097205, at *3 (W.D. Ky. Mar. 22, 2017) (no final agency action because DOE was still conducting cite visits at college and "had not issued" a program review report, and holding that "[w]hen the DOE issues a final program review determination, that final agency action will be subject to judicial review pursuant to 34 C.F.R. §§ 668.111-668.124.").

The same result follows here. Because the administrative program review is ongoing, the Department's July 18, 2022 letter cannot be said to be DOE's "last word" on the subject "[s]hort of an enforcement action," *Allsteel, Inc. v. U.S. E.P.A.*, 25 F.3d 312, 315 (6th Cir. 1994), where a Final Program Review report has yet to be issued to EGCC.

*American Bar Association v. Department of Education*, 370 F.Supp.3d 1 (D.D.C. 2019)— relied upon by EGCC, *see* Pl.'s Mot. at 6-7—is not to the contrary. In that case, the Department of Education sent denial-of-benefit letters directly to borrowers that the Department had determined were not eligible for the Public Service Loan Forgiveness Program because they were not working for qualifying employers. The District Court found that, "upon sending the denial letters to the Individual Plaintiffs, the Department had completed its determination that their employment and the loan payments at issue did not qualify." *Id.* at 20. Here, by contrast, EGCC's eligibility to participate in the Pell Grant program was not categorically barred by the Department's

action: the Department explained that EGCC students that were not part of the Free College Benefit Program could continue to receive Pell Funds even without any revisions to the Free College Benefit Program.  *See* Ex. 3.  Moreover, the language in the case-and-desist letter is not as categorical as EGCC suggests (and as the communications to the Individual Plaintiffs in *American Bar Association* appear to have been).  Rather than suggest that EGCC could never expect to access Title IV funds for its students, the letter stated only that "EGCC must not disburse Pell funds to any new students enrolling in the Free College Benefit Program *until it is redesigned to charge full tuition and fees to all non-Pell eligible students*." Pl's. Mot., Ex. 1 at 2 (emphasis added).

Moreover, as the district court observed in *American Bar Association*, when applying "the first *Bennett* prong, courts also look to 'the way in which the agency subsequently treats the challenged action.'" *Am. Bar Ass'n*, 370 F. Supp. 3d at 20 (quoting *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016)).  In *American Bar Association*, there was no opportunity for the individual plaintiffs to submit additional documentation regarding their employment status and alleged eligibility for the PSLF program: "[a]fter the Department issued the denial letters, the Individual Plaintiffs did not receive any additional communication from the Department suggesting that the letters were tentative or interlocutory." *Id.* at 21.

Here, the very opposite has occurred.  The challenged letter itself notes that the program can be "redesigned" to bring it into compliance with Title IV, and notes that, "to accomplish this, EGCC must cease waiving the tuition and fees for non-Pell students." Pl's Mot., Ex. 1 at 2.  Far from announcing a final verdict on EGCC's ability to access Title IV funds for Pell-eligible students under the Free College Benefit Program, the letter informs EGCC of precisely how they can continue to operate the program: assess costs of attendance equally among the two categories of students, as Title IV requires.  Moreover, the letter indicates that "the Department will provide

directives regarding currently enrolled students shortly" and invites EGCC to assist with this process by providing additional documentation." *Id.*

The parties have continued to engage fruitfully on a path forward.  For example, on August 5, 2022—in response to a series of questions that EGCC sent to the Department—the Department suggested in a response letter that "[t]o remedy the situation, EGCC could seek funding from outside sources including third party grants or endowments." Pl.'s Mot., Ex. 6 at 2.  EGCC followed up on August 10, 2022 with a proposal to have an outside foundation provide funding for the last-dollar scholarship program.  *See* Compl. ¶ 39.  The Department is formulating a response to this proposal and expects to provide that response in the near future.  This is a far cry from the sort of finality encountered by the court in *American Bar Association*.

### B.     The Department's Position in the Cease-and-Desist Letter Does Not Constitute a Limitation, Suspension, or Termination Under 20 U.S.C. § 1094(c)(1)(F) and the Applicable Regulations.

Even assuming the Department's July 18, 2022 letter constituted final agency action—and it plainly does not—EGCC's argument that the Department has exceeded its statutory authority by sending the July 18th letter, *see* Pl.'s Mot. at 10-13, flows from a misreading of the statute and regulations and is correspondingly without merit.    EGCC invokes 20 U.S.C. § 1094(c)(1)(F), which provides that "the Secretary shall prescribe such regulations as may be necessary to provide for . . . the limitation, suspension, or termination of the participation in any program under this subchapter of an eligible institution, or the imposition of a civil penalty under paragraph (3)(B) whenever the Secretary has determined, after reasonable notice and opportunity for hearing, that such institution has violated or failed to carry out any provision of this subchapter, any regulation prescribed under this subchapter."  EGCC characterizes the Department's July 18 letter as a limitation proceeding which 1) should have been accompanied by an advance notice and

opportunity for a hearing under § 1094(c)(1)(F), and 2) needed to comply with the procedural requirements for limitation proceedings further spelled out in the implementing regulations, *see* 34 C.F.R. § 668.86(b). *See generally* Pl.s' Mot. at 10-13. Neither argument has merit.

### 1. The Cease-and-Desist Letter is Not a "Limitation" and the Department's Actions Were Consistent with the HEA and Regulations.

The Department's letter does not limit the ability of EGCC to participate in federal student aid programs, nor does it purport to suspend or terminate the program participation agreement. Instead, the letter announces the Department's view that, as currently constituted, the Free College Benefit Program offered by EGCC requires Pell Grant recipients to foot the bill for the non-Title IV eligible students, in violation of Title IV. Therefore, the students receiving Pell Grants under the program were not eligible to receive such grants, and, as stated in the letter "EGCC must not disburse Pell funds to any new students enrolling in the Free College Benefit Program until it is redesigned to charge full tuition and fees to all non-Pell eligible students." Pl.'s Mot., Ex. 1 at 2. Thus, while the letter does express the Department's views on the structure of a program designed and supervised by EGCC, the "limitation" contained in the letter—such as it is—is on the *eligibility of certain students to receive Pell Grants*, not on the ability of the institution to participate in Title IV. *See* Pl.'s Mot. Ex. 4 to EGCC's appeal (describing July 18th letter as "a cease and desist letter regarding the institution's disbursement of Title IV funds to ineligible students."); *cf. Bowling Green Jr. Coll. v. U.S. Dep't of Educ.,* 687 F. Supp. 293, 297 (W.D. Ky. 1988) ("However, the actions of the Department did not interfere with [the institution's] entitlement to participate in the programs; it only altered the method of payment. The College has no property right to the funds as it acts only as a fiduciary in dispersing the funds to its *eligible students*.") (emphasis added).

The regulations further contain examples of the sorts of administrative actions that may constitute a "limitation" on a program's ability to participate in federal student aid programs, which

further make clear that a determination of student eligibility for particular grants or aid programs—like the type here—does not constitute a "limitation" on EGCC's participation in Title IV programs. The regulations provide the following examples of what constitutes a "limitation":

> (a) A limit on the number or percentage of students enrolled in an institution who may receive Title IV, HEA program funds;
>
> (b) A limit, for a stated period of time, on the percentage of an institution's total receipts from tuition and fees derived from Title IV, HEA program funds;
>
> ***
>
> (g) A requirement that an institution obtain surety, in a specified amount, to assure its ability to meet its financial obligations to students who receive Title IV, HEA program funds;
>
> (h) A change in the participation status of the institution from fully certified to participate to provisionally certified to participate under § 668.13(c).

34 C.F.R. § 668.94 (omitting examples dealing with third-party servicers). The Department's letter here does not purport to set a limit on the number or "percentage" of enrollees at EGCC who may be Pell-eligible; it does not impose a cap on total receipts from tuition or fees from Pell grants; it does not impose surety or other financial obligations on the college; and it does not change the school's certification. The regulations therefore further suggest that a determination of student eligibility (or ineligibility) for Pell funds is not considered a limitation.

Because the issuance of the cease-and-desist letter concerns EGCC's disbursement of Title IV funds to ineligible students—rather than the ability of EGCC to participate in Title IV programs generally—it is not a limitation aimed at EGCC in a manner contemplated by the plain text of the statute or regulations.[4] Moreover, there is no merit to Plaintiff's argument, *see* Pl.'s Mot. at 13,

---

[4] Should the court harbor any doubt on this issue, the agency's interpretation of its regulations—and the definition of "limitation"—would be entitled to deference under established principles of administrative law. An agency's interpretation of its regulations is "is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also*
(*footnote continued on next page*)

that cease-and-desist letters are not authorized under the HEA or regulations. The Secretary is tasked with "ensuring the integrity of the Federal student financial assistance programs authorized under subchapter IV," 20 U.S.C.A. § 1018(b)(2)(a)(vi), and there is nothing in the statute preventing the Secretary from employing cease-and-desist letters as an interim step that alerts institutions when potential violations have been found, allowing them to avoid incurring additional liability while the Department finishes its program review.

### 2. Subsequent Dealings Between the Parties Reinforce that EGCC Has Not Suffered a Limitation on its Ability to Participate in the Pell Grant Program.

Practical considerations and the course of dealing between the parties further reinforce that EGCC has not suffered an institutional limitation on its ability to participate in the Pell Grant program. On July 27, 2022, Dr. Early wrote to Mr. Geoghegan and emphasized that "Students enrolled outside of the Free College Benefits Program are also eligible for Title IV funding, so long as the Title IV students and non-Title IV students are charged the same amount for tuition." *See* Exhibit 3. In other words, EGCC was free to continue to access Title IV funds for its students (including local Ohio residents) who were "enrolled" in EGCC "outside of the" nationwide Free College Benefit Program because the *eligibility of those students to receive Pell Funds* was not

---

*Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) ("We have explained *Auer* deference (as we now call it) as rooted in a presumption about congressional intent—a presumption that Congress would generally want the agency to play the primary role in resolving regulatory ambiguities."). Such deference is particularly appropriate in specialized regulatory fields where the agency's expertise warrants a special role in interpreting prior regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program."). Moreover, this "deference does not depend on the agency crystallizing its construction through formal rulemaking or adjudication, *see Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust*, 410 F.3d 304, 319 (6th Cir. 2005). Here, the Department has repeatedly taken the position in correspondence to EGCC that the cease-and-desist letter was not a limitation. *See* Pl.'s Mot., Ex. 4, Ex. 6.

(thus far) called in to question by the Department's program review and by the cease-and-desist letter (emphasis added).

Moreover, in the July 27th email, Dr. Early stated that "the Department can confirm that the students who were accepted for enrollment in the Free College Benefits Program prior to the date of the cease-and-desist letter can be awarded Title IV aid for the Fall semester." Ex. 3. That position was reiterated and expanded two days later in further correspondence to include students who had not yet registered for Fall classes as of the date of the cease-and-desist letter. *See* Pl.'s Mot., Ex. 5 ("The Department has received questions regarding students who had been attending the Free Benefit Program at Eastern Gateway Community College for the Spring and/or Summer sessions, but had not registered for classes by the date of the cease-and-desist letter (July 18, 2022). This email is to confirm that these students may receive Title IV aid for the Fall 2022 semester."). EGCC students were thus able to access Pell Grants as before the cease-and-desist letter—and the school was able to continue its usual Fall semester operations—while negotiations toward a redesign of the program continued, further undermining any claim on the part of EGCC to have suffered a "limitation" on its ability to participate in any Title IV program.

Those negotiations are ongoing. As EGCC alleges, on August 10, 2022, it sent the Department "a proposed redesign of the Program in which the last-dollar scholarships would be funded through the EGCC Foundation, a distinct 503(c)(4) non-profit entity." Compl. ¶ 39. The Department expects to respond to that letter with detailed feedback in the near future. It is simply not persuasive to characterize the Department's actions as imposing a limitation on EGCC's ability to participate in Title IV.

### C. EGCC Mischaracterizes the Nature of the Department's Teachout Request, Which is Not Mandatory And Thus Not Subject to Section 1094.

EGCC also suggests, without basis, that the Department "required" the college to enter into

a teach-out agreement, and that this request will have the practical effect of forcing its students to transfer to other institutions. *See* Compl. ¶ 40 (alleging that on August 10, "EGCC received additional correspondence from DOE requiring EGCC to propose and then enter into a teach-out agreement within thirty (30) days" and that "The teach-out agreement will effectively require EGCC students, including but not limited to students enrolled in the Program prior to July 18, 2022, to transfer out of EGCC to complete their programs of study."); Pl's Mot. at 11 ("The DOE's subsequent demand that ECC enter into a teach-out agreement is further evidence that the cease-and-desist letter is a limitation"). This argument—and EGCC's effort to portray the teach-out letter as a standalone "enforcement action"—fails for at least two reasons.

*First*, under the plain language of the HEA and implementing regulations, teach-out plans and agreements are protective contingencies that allow students to easily transition to another program of study in the event their current institution is no longer able to operate, or is forced to shut down suddenly. *See* 20 U.S.C. § 1094(f)(2) ("the term 'teach-out plan' means a written plan that provides for the equitable treatment of students *if an institution of higher education ceases to operate before all students have completed their program of study*, and may include, if required by the institution's accrediting agency or association, an agreement between institutions for such a teach-out plan.") (emphasis added); 34 C.F.R. § 600.2 (defining a teach-out agreement as one that "provides for the equitable treatment of students and a reasonable opportunity for students to complete their program of study *if an institution . . . ceases to operate* or plans to cease operations before all enrolled students have completed their program of study.") (emphasis added). EGCC's suggestion that the Department's teach-out letter *forces* students to transfer while students are enrolled at EGCC and taking classes during the Fall semester is baseless and simply fails to comprehend the entire point of a teach-out agreement. Nobody is forced to transfer from EGCC

31

to anywhere else under the requested teach-out agreement unless the school ceases its operations.

*Second*, EGCC further misstates the record in suggesting that the Department has "required" or "demanded" the EGCC submit a teach-out agreement to the Department. The teach-out letter is titled "Request for a Teach-Out Agreement," *see* Pl.'s Mot., Ex. 8, and recognizes that HLC, EGCC's accreditation agency—which exercises primary responsibility over teach-out plan requirements—has already "required the institution to submit a teach-out plan." *See* Ex. 2 at 2 & n.2 (HLC letter to EGCC requiring development of a "provisional plan" and citing HLC Regulations dealing with "Commission Approval of Institutional Teach-Out Arrangements"). *Cf. Caruso Tr. for ITT Educ. Servs. Inc. v. Modany,* No. 118CV02182JPHTAB, 2022 WL 2305693, at *3 (S.D. Ind. June 27, 2022) ("teach-out plans are only required to be submitted *to a school's accreditor* when specific, triggering events occur") (emphasis added). The Department's letter merely parrots the requirements already imposed on EGCC by its accreditation agency (HLC), and notes that "the Department believes it is in the best interests of students for EGCC to enter into a teach-out agreement with an institution or institutions to assist students if they are unable to finish their programs of study." Pl.'s Mot., Ex. 8. Therefore, while EGCC argues that the teach-out request reinforces that the Department has imposed a limitation on EGCC's Title IV ability to participate in Title IV, *see* Pl.'s Mot. at 11, the Department has not "required" a teach-out agreement here. *Cf.* 20 U.S.C. § 1094(f)(1) ("the Secretary shall require" a teach-out agreement "[i]n the event the Secretary initiates the limitation, suspension, or termination of the participation of an institution of higher education in any program under this subchapter.")

### D. The Department's Determination in the Cease-and-Desist Letter Is Not Arbitrary and Capricious.

EGCC is likewise unable to succeed on the merits of its claim that the Department's determination in the cease-and-desist letter—that as currently structured the Free College Benefit

32

Program violates Tile IV—is arbitrary and capricious under the APA.  The HEA defines "cost of attendance" as "tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study."  20 U.S.C.A. § 1087*ll*.  Courts interpreting this provision have explained that the definition refers to a tally of expenses actually incurred by a student by virtue of his or her attendance at the institution.  *See Noerand v. Devos*, 474 F. Supp. 3d 394, 401 (D. Mass. 2020) ("Title IV's definition of 'cost of attendance' refers simply to the tuition and fees accrued by a student attending an educational institution and makes no mention of a students' . . .Title IV eligibility."); *Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *11 (N.D. Cal. June 17, 2020) (noting that the "cost of attendance" lists "the types of expenses associated with student attendance at IHEs, such as tuition, books, and room and board"). *Cf. In re Marriage of Larsen*, 912 N.W.2d 444, 450 (Iowa 2018) ("We believe the cost of attendance as published by each institution pursuant to 20 U.S.C. § 1087*ll* is presumed to be the reasonable and necessary cost of attending an in-state public institution for a course of instruction.")

Under this straightforward statutory language, the Department reasonably concluded that because Title IV recipients at EGCC were assessed tuition and fee costs in the form of their Pell Grants (which were actually collected by the school), while non-Pell Grant recipients in the Free College Benefit Program were not being "assessed" anything, this disparate treatment of Pell-eligible students violated Title IV.  In other words, while the school's ledgers made it appear that all students were charged the same tuition costs, as a practical matter only one group of students (Title IV students) was actually assessed real-world tuition costs, since all other students were having their costs written off.

EGCC's counter-arguments lack force. *First*, EGCC argues that it "assessed (charged) the same tuition and fees for all union-affiliated students in the Program regardless of financial aid eligibility." Pl.'s Mot. at 14. However, this is simply a fiction because the non-Title IV eligible students had all of these costs written off by the school, and thus these tuition costs and fees were not "assessed" in any sense of the word. The amounts were not "charged to all students," Pl.'s Mot. at 14—as to the non-Title IV eligible students, they were not charged at all. Nor is it material that the Title IV students themselves are not paying the tuition costs and fees or incurring debt in order to fund their education. Section 1087 only speaks of tuition and fees "assessed a student"; it does not require that the student herself actually pay, and the statutory definition plainly covers situations where grants—rather than loans or on-hand cash—are funding the student's course of study.

*Second*, while EGCC is correct that institutions can treat Pell funds the same way they do dollars paid in cash in terms of funding various programs and initiatives, *see* Pl.'s Mot. at 15, this drastically understates the scope of EGCC's Free College Benefit Program, where Pell Funds alone are funding the entire academic program, including for non-Title IV eligible students (resulting in the disparate treatment discussed above). Moreover, unlike cash payments, Pell Funds are required to be returned to the Department of Education if a student discontinues his or her enrollment in the middle of a semester, and here EGCC has no mechanism to track Title IV enrollment and whether students are finishing their courses of study. Given the exclusive reliance on Pell Funds to bankroll the broader program, the Department reasonably concluded that such a program violates Title IV.

## III. THE REMAINING PRELIMINARY INJUNCTION FACTORS COUNSEL IN FAVOR OF DENYING RELIEF

EGCC's claim to have suffered irreparable harm as a result of the Department's actions lack merit. As an initial matter, each of the four "categories" of harm identified by EGCC as

supporting its need for immediate relief—which fail on their own terms in any event—fall short of meeting the requirement in the Sixth Circuit that a party show that it "will suffer actual or imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Any harms that EGCC may suffer would not manifest until January at the earliest, when the Spring semester begins. While EGCC alleges in passing that enrollment for the Spring semester will begin in October, *see* Pl.'s Mot. Ex. A (Geoghegan Decl. ¶ 32), EGCC provides no details regarding precisely when the enrollment window will open, or why the school could not enroll students later in the Fall for the Spring semester. Any harm, then, is far from imminent as required for extraordinary relief. EGCC's arguments to the contrary are unpersuasive.

*First,* EGCC's claim to have suffered "irreparable financial harm," Pl.'s Mot. at 17, ignores that EGCC has been able to draw on Pell Grant funding for students enrolled in the Fall semester.[5] *See* Pl.'s Mot., Ex. 5. Moreover, EGCC and Defendants continue to engage in a meaningful exchange over possible revisions to EGCC's scholarship program that would bring the program into compliance with Title IV's prohibition on disparate tuition charges between Pell Grant recipients and other students. Additionally, EGCC's argument that the cease-and-desist letter "threatens its continued operations as a community college," Pl.'s Mot. at 18, ignores that the Department has specifically informed EGCC that students attending the school outside the parameters of the nationwide Free College Benefit Program—including local county residents—may continue to access Pell Funds for their education at EGCC.

---

[5] Here, EGCC also repeats the nonsensical argument that the requested teach-out agreement "effectively secur[es] the transfer of all current students to other institutions," Pl.'s Mot. at 17, but as discussed *supra* Section II.C, that argument simply misunderstands the entire point of a teach-out agreement. No students are required to leave EGCC under any action the Department has taken.

*Second*, EGCC perplexingly argues that it has suffered imminent "reputational harm," Pl.'s Mot. at 18, when it was EGCC itself that first publicly revealed the existence of the Department's program review and July 18 cease-and-desist letter, first in the context of defending a lawsuit brought against EGCC by Student Resource Center, *see* Def's Br. in Opp'n to Motion to Show Cause, *Student Resource Center v. EGCC*, 22-cv-002653 (S.D. Ohio Aug. 18, 2022), ECF No. 22 at 1, and now in this lawsuit. EGCC cannot claim irreparable harm from public disclosure of the program review and the cease-and-desist letter brought about by its own actions. *See Livonia Properties Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC*, 399 F. App'x 97, 104 (6th Cir. 2010) ("self-inflicted harm is not the type that injunctions are meant to prevent"); 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE CIV. § 2948.1 (2d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

*Third,* EGCC's claim to have suffered imminent and irreparable "student harm," *see* Pl.'s Mot. at 19, has it exactly backwards: concerns about whether EGCC can continue to operate in a sustainable fashion, along with other concerns on the part of regulators with the school's practices and the probationary action taken by the school's accreditation agency, were what led the Department to place the school on HCM2 status, precisely to protect students. *See* Pl.'s Mot., Ex. Ex. 7. Moreover, the Department suggested that the school enter into a teach-out agreement with other institutions precisely to avoid student harm in the event that EGCC was required to fold. *See* Pl.'s Mot., Ex. 8. Were EGCC truly concerned with avoiding student harm, it would have taken affirmative steps toward establishing a teach-out agreement.

*Fourth,* in cursory fashion EGCC argues that it has suffered constitutional harm from a denial of its due process rights. *See* Pl.'s Mot at 20. However, as discussed *supra* Section II.B.1,

the Department was not required to follow the precise procedures in the Subpart G regulations because the cease-and-desist letter does not impose a "limitation" on EGCC's participation in Title IV programs, and in any event EGCC has received (and continues to receive) adequate process.

Finally, with respect to the final two preliminary injunction factors, "[t]he harm to the opposing party and the public interest factors merge when the Government is the opposing party." *Wilson v. Williams*, 961 F.3d 829, 845 (6th Cir. 2020); *see also R.K. v. Lee*, 563 F. Supp. 3d 774, 786 (M.D. Tenn. 2021) ("When the government opposes injunctive relief, the third and fourth elements merge.").

Here, the public interest would be disserved by an injunction because it would undermine the ability of the Department to secure compliance with Title IV through consultative mechanisms like cease-and-desist letters and negotiations with a school to help them resolve issues in their programs proactively so as to avoid incurring larger liability.

Additionally, an injunction here would hamper the ability of the Department to affirmatively identify Title IV problems at institutions during the course of a broader program review and would instead require the Department to await the issuance of a final program review before it could inform a school of a violation, which would be costly, inefficient, and harmful to students.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to dismissal for lack of subject matter jurisdiction. Should the court determine that it has jurisdiction over EGCC's claims, the court should deny EGCC's Motion for Preliminary Injunction.

Dated: September 20, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

s/ Alexander N. Ely
ALEXANDER N. ELY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005
Tel: (202) 993-5177; Fax: (202) 616-8470
alexander.n.ely@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 20, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

/s/ Alexander N. Ely
Alexander N. Ely

*Counsel for Defendants*